## LONG & FOSTER REAL ESTATE, INC., ET AL.

### V.

## MARY W. CLAY

Record No. 830206

April 25, 1986

Present: All the Justices

*Robert A. Johnson (Teresa K. Rawoot; Johnson & Ostby*, on briefs), for appellants.

*Raymond J. Diaz (Rees, Broome & Diaz, P.C.*, on brief), for appellee.

CARRICO, C.J., delivered the opinion of the Court.

Long & Foster Real Estate, Inc. (Long & Foster), filed a motion for judgment against Mary W. Clay (Clay) seeking recovery of a real estate commission in the amount of $13,000 allegedly due on the sale of a tract of land owned by Clay in Fairfax County. Clay filed grounds of defense and a counterclaim against Long & Foster and its agent, Rita Marsh (Marsh), for damages allegedly caused by Marsh's breach of fiduciary duty in the handling of the sales transaction. Clay also filed a third party motion for judgment against Marsh for indemnification in the event Clay was held liable to Long & Foster.

The case was tried before a jury, and three verdicts were returned on forms provided by the court. On Long & Foster's claim for a commission, the jury found in favor of Clay. On Clay's counterclaim against Long & Foster and Marsh, the jury returned this verdict:

> We, the Jury, on the issue joined in the case of Mary W. Clay . . . versus Long & Foster Real Estate, Inc., . . . find our verdict in favor of [Mary W. Clay] and assess her damages in the amount of $4,000.

On Clay's third party motion for judgment, the jury returned a verdict in favor of Clay against Marsh for $1.00.

Long & Foster and Marsh moved to set aside the verdicts returned on Long & Foster's original claim and Clay's counterclaim. The trial court denied the motion. On Long & Foster's original claim, the court entered judgment in favor of Clay. On

Clay's counterclaim, the court entered judgment in her favor for $4,000 against both Long & Foster and Marsh. With respect to the $1.00 verdict in favor of Clay against Marsh, the court on its own motion set the verdict aside and dismissed Clay's third party motion for judgment.[1]

Long & Foster and Marsh contend the trial court erred in entering judgment against them on the $4,000 verdict. They argue that because they were proceeded against as master and servant and the liability of Long & Foster was predicated solely upon the doctrine of respondeat superior, a finding of liability against Marsh as the servant was "a necessary premise" to a finding of culpability against Long & Foster as the master. Citing several Virginia cases,[2] Long & Foster and Marsh say that where a master and a servant are proceeded against jointly and the liability of the master is derivative, a verdict against the master and in favor of the servant, or silent with respect to the servant, exonerates not only the servant but the master as well.

■ We do not agree that the trial court erred in entering judgment against Long & Foster and Marsh on the $4,000 verdict. In *Cape Chas. Flying Ser. v. Nottingham*, 187 Va. 444, 47 S.E.2d 540 (1948), we said:

> "Verdicts are to be [fairly] construed, and, if the point in issue is substantially decided by the verdict, it is good, and when the meaning of the jury can be satisfactorily collected from the verdict, upon the matters involved in the issue, it ought not to be set aside for irregularity or want of form in its wording."

*Id.* at 454, 47 S.E.2d at 545 (quoting *Peters v. Johnson, Jackson and Co.*, 50 W. Va. 644, 645-46, 41 S.E. 190, 190 (1902)).

We think the way Long & Foster and Marsh would have us read the verdict would produce an unfair result. They would have

---

[1] The court obviously took this action because the third party motion for judgment sought indemnification for Clay in the event she was held liable to Long & Foster, and this eventuality never occurred.

[2] *Atl. Greyhound Corp. v. Shelton*, 184 Va. 684, 36 S.E.2d 625 (1946); *Monumental Motor Tours v. Eaton*, 184 Va. 311, 35 S.E.2d 105 (1945); *Va. State Fair Ass'n v. Burton*, 182 Va. 365, 28 S.E.2d 716 (1944); *Gable v. Bingler*, 177 Va. 641, 15 S.E.2d 33 (1941); *Lough v. Price and Dix*, 161 Va. 811, 172 S.E. 269 (1934); *Barnes v. Ashworth*, 154 Va. 218, 153 S.E. 711 (1930); *Ivanhoe Furnace Corp. v. Crowder*, 110 Va. 387, 66 S.E. 63 (1909).

us say that the clause, "in the case of Mary W. Clay . . . versus Long & Foster Real Estate, Inc.," means the verdict was against Long & Foster alone. In our opinion, the language of the clause, fairly read, is parenthetical and descriptive, intended to identify the case in which the verdict was returned, rather than the party or parties against whom returned.

When the verdict is fairly read, its operative and decisive language is: "We, the Jury, . . . find our verdict in favor of [Mary W. Clay]." This language represents a general finding in favor of Clay and constitutes a verdict against both Long & Foster and Marsh.[3] *Cape Chas. Flying Ser.*, 187 Va. at 455, 47 S.E.2d at 545; *Lough v. Price and Dix*, 161 Va. 811, 818, 172 S.E. 269, 271 (1934); *Fishburne v. Engledove*, 91 Va. 548, 560, 22 S.E. 354, 356 (1895).

Long & Foster and Marsh next contend there is no evidence in the record to support a finding that Marsh breached her duty as a real estate salesperson in her dealings with Clay. This duty was expressed in two instructions granted by the trial court, without objection, as requiring Marsh to explain the terms of the sales contract to Clay and also to explain that "the contract contained terms different from the terms described in the listing agreement."

On this point, the record shows that on November 15, 1981, Clay gave Marsh, as Long & Foster's agent, an exclusive listing to sell the property in question for $130,000. Clay told Marsh she would consider accepting a first deed of trust for part of the sales price provided she "could get enough [cash] to pay off the debt" then existing on the property. Clay also told Marsh she would not accept a second trust, and a printed provision in the listing agreement which would have permitted a second trust was lined out.

On December 20, 1981, Marsh presented Clay with a "Land Sales Contract" signed by Jim L. Blevins, who rented the property in question from Clay. In the contract, Blevins agreed to purchase the property and to pay Clay $25,000 in cash and $105,000 in monthly installments. The contract called for settlement within 10 days and provided for the payment of a 10% sales commission. The contract also contained a clause requiring Clay "to subordinate [to] a bona-fide construction loan."

---

[3] Long & Foster and Marsh assert on brief that the trial court "amended" the jury's verdict to include Marsh; however, the trial court did not amend the verdict. The court merely construed the verdict to include Marsh, just as we have construed it here.

Clay asked Marsh what the subordination clause meant. Marsh gave an explanation, but Clay "didn't understand it" and asked again what the clause meant. This time, Marsh "made no explanation that [Clay] could make head [or] tails of."

Although the transaction as proposed in the contract would not "get [Clay] enough [cash] to pay off the debt," she went ahead and signed the contract. She signed, Clay said, because she thought the contract was consistent with the terms of the listing agreement and "[b]ecause Mrs. Marsh kept urging [her] to sign it"; Marsh kept saying: "Sign it, Mrs. Clay. Sign it now so we can hurry and go to settlement."

In a day or two after she signed the contract, Clay learned from "some of the lawyers" where she worked "what [the subordination clause] meant." She then wrote Long & Foster on December 23, 1981, stating she was revoking the contract because its terms were unsatisfactory and had not been explained to her "total satisfaction."

On December 24, 1981, Blevins' attorney wrote Clay advising her that settlement of the contract was scheduled for December 28 in the attorney's office. Clay did not appear. Blevins appeared and tendered performance according to the terms of the contract. As part of the tender, Blevins presented a signed deed of trust containing a subordination clause.

In January 1982, Clay employed Gary Peterson, an attorney. He negotiated a new contract with Blevins which eliminated the subordination clause appearing in the earlier contract; however, the new agreement contained a provision requiring Clay to grant partial releases on the payment of specified amounts. The new agreement contained no provision for payment of a real estate commission.

Settlement was held on the new contract, and by deed dated April 14, 1982, Clay conveyed the property in question to Blevins. She received in return a promissory note secured by a deed of trust which provided for partial releases in accordance with the terms of the new contract.

Long & Foster and Marsh argue that Marsh fulfilled the duty she owed Clay to disclose the significance of the subordination clause in the first Blevins contract. While Clay established the materiality of the alleged non-disclosure, Long & Foster and Marsh say, the evidence shows clearly that Clay was made aware of the subordination clause and that Marsh in good faith ex-

plained the meaning of the clause as she understood it. Marsh's duty of explanation ceased, Long & Foster and Marsh conclude, when she disclosed all the material facts and "imparted to Clay her understanding of those facts."

The difficulty with this argument is that it does not recognize the sharp conflict in the evidence concerning the explanation Marsh gave Clay of the meaning of the subordination clause. Marsh testified she told Clay that the clause meant that when Blevins secured a construction loan, "[a]t that time, [Clay] would have the second deed of trust" and "[t]he bank would hold the first deed of trust."

Clay testified, however, that Marsh told her the clause meant Blevins wanted to "build a building on the property" and "[w]ell, it means that you would subordinate a construction loan . . . [a]nd it would make your property much more valuable." In short, according to Clay's testimony, Marsh said subordination meant subordination, which, of course, was no explanation at all. Obviously, the jury believed Clay's version of Marsh's explanation and thus had sufficient evidentiary basis to conclude that Marsh breached her duty of explanation.

■ Finally, Long & Foster and Marsh contend that the evidence is insufficient to support the award of $4,000 in damages to Clay. On this point, the record shows that Clay would not have signed the first Blevins contract had she known the effect of the subordination clause and that, as a result of the presence of the clause, she had to accept a provision for partial releases when she negotiated the new contract with Blevins.

Further, Clay produced an expert witness who testified without objection that a deed of trust note subject to either a subordination clause or a provision for partial releases would be worth from 50% to 60% of the face amount of the note, if discounted. On the other hand, the witness said, a note not subject to either limitation would be worth from 75% to 80% of the face amount, if discounted. This testimony indicated Clay's damages were considerably higher than the amount awarded and, hence, was sufficient to support an award of $4,000. *Jefferson Stand. Ins. Co.* v. *Hedrick*, 181 Va. 824, 835, 27 S.E.2d 198, 202-03 (1943).

But, Long & Foster and Marsh argue, the "critical flaw in Clay's attempted proof of damages is that the expert testimony on the diminished value of the note hinged upon Clay's selling the note," and Clay did not testify she had "any intentions of selling

the note." We do not agree that proof of an intention to sell the note was essential to Clay's proof of damages. Clay's measure of damages was the difference between the value of the note she bargained for in the first contract and the value of the note she actually received.

Finding no error in the record, we will affirm the judgment of the trial court.

*Affirmed.*