Present:   All the Justices

PROSPECT DEVELOPMENT COMPANY, INC.,
ET AL.
                              OPINION BY JUSTICE LEROY R. HASSELL, SR.
v.  Record No. 981673              June 11, 1999

STEVEN M. BERSHADER, ET AL.

             FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
                       David T. Stitt, Judge

                                I.

     In this appeal of a decree, we consider, among other

things, whether the purchasers of real estate presented

sufficient evidence to prove the sellers' actual fraud,

constructive fraud, and breach of contract and to establish an

easement by estoppel in certain of the sellers' land.

                         II.  PROCEEDINGS

     Steven M. Bershader and his wife, Marguerite F. Godbold

(the Bershaders), filed their second amended bill of complaint

against Prospect Development Company, Inc. ("Prospect

Development"), Alan Huntley Seeley, and Paul F. Lucas.  The

Bershaders alleged that the defendants breached a real estate

sales contract and committed acts of actual and constructive

fraud.  The Bershaders sought compensatory and punitive

damages, injunctive relief, and attorney's fees and costs.

The Bershaders also requested a declaration that they owned a

negative easement in certain real property.  The defendants

filed responsive pleadings in which they denied liability.

At the conclusion of an <u>ore</u> <u>tenus</u> hearing, the chancellor held that the defendants had breached the real estate sales contract and that they had committed acts of actual and constructive fraud upon the Bershaders. The chancellor also held that the Bershaders owned a negative easement in certain real property and granted an injunction to enforce the rights accorded by the easement. The chancellor awarded the Bershaders compensatory damages and attorney's fees, but refused to award punitive damages. Prospect Development and Seeley appeal.

### III. FACTS

When the chancellor hears evidence <u>ore</u> <u>tenus</u>, his decree is entitled to the same weight as a jury verdict, and we are bound by the chancellor's findings of fact unless they are plainly wrong or without evidence to support them. <u>Rash</u> v. <u>Hilb, Rogal & Hamilton Co.</u>, 251 Va. 281, 283, 467 S.E.2d 791, 793 (1996). Additionally, we will review the evidence and all reasonable inferences fairly deduced therefrom in the light most favorable to the Bershaders, the prevailing parties below. <u>Id.</u>

In the spring of 1993, the Bershaders, who were looking for a new home, visited the Bennett Farms subdivision in Fairfax County. This subdivision is also referred to as Southern Oaks. The Bershaders met with Nancy Brown, a sales

agent for Prospect Development, which was the developer of the subdivision.  The Bershaders, who are naturalists and birdwatchers, wanted to purchase a home on a lot with a natural woodland environment.  Brown was aware of the Bershaders' interests in wildlife and birds, and she knew that the Bershaders wanted a lot which would provide them with privacy and a natural woodland environment.

Brown showed the Bershaders a plat of the Southern Oaks subdivision that identified Lot 23 and an adjacent lot identified as "Outlot B."  Outlot B was designated on the plat as "preserved land."  Brown informed the Bershaders that the parcel was designated "preserved land" because it had not "passed" a water percolation test.  Brown told the Bershaders that a house could not be constructed upon Outlot B because the lot "did not perk."  Brown gave the Bershaders a brochure which contained a plat of a portion of the subdivision.  On this plat, Lot 23 was adjacent to Outlot B, and Outlot B was designated as "preserved land."

The Bershaders had a subsequent meeting with Brown.  They asked her particular questions about the phrase "preserved land" because they had never seen that designation on a plat. Brown told them that Outlot B "had been tested and perked and it would not perk and so it could not be built upon."  In response to the Bershaders' question, "what did perk mean?",

3

Brown replied that "you needed to have a septic field located on the lot and because it didn't perk, [Prospect Development] couldn't locate a septic field on the lot and so [Prospect Development] would not be able to build any house on it and it would not be developed." Brown further told the Bershaders that "there was no possibility of any development or any . . . house being sited on [Outlot B]."

The chancellor also received evidence that the Fairfax County Health Department will not approve the construction of a septic field on a lot if the results of a water percolation test are not acceptable. The test determines the rate of water absorption in soil and provides a measurement of the allowable rate of sewage application to a soil absorption system.

The Bershaders subsequently met with Seeley, a vice-president of Prospect Development. Brown had informed the Bershaders that Seeley was the "project engineer" for the subdivision. Seeley told the Bershaders that Outlot B would not "perk" and that a house could not be constructed upon the lot. When Ms. Godbold asked Seeley whether Outlot B's designation as "preserved land" could change, Seeley responded that "once it's been tested it's done and it's — it never is going to be developed upon."

4

The Bershaders also met Paul Lucas, an agent of Prospect Development, who actively participated in the marketing and sales of the lots in the subdivision. The Bershaders asked Lucas about Outlot B's designation as "preserved land." Lucas stated that the lot would not "perk" and, therefore, a house could not be constructed upon the lot.

The Bershaders requested that Prospect Development reduce the price of Lot 23 because it did not percolate well, and for that reason, many trees on the lot would have to be removed so that a triple septic field could be constructed upon the lot. Seeley rejected the Bershaders' request for a reduction of the price and required that they pay a "premium" of $15,000 for Lot 23. Seeley informed the Bershaders that Lot 23 was adjacent to Outlot B which was "preserved land," and that they would have a view of the natural woodland environment as well as privacy. Seeley told the Bershaders that Prospect Development "could build this [house] for you elsewhere and you wouldn't have to pay that lot premium then, but then it wouldn't be next to the preserved land."

In May 1993, the Bershaders met with Seeley, and Mr. Bershader "pressed" Seeley about the meaning of Outlot B's designation as "preserved land." Seeley told the Bershaders that Outlot B "had been tested and that it . . . didn't perk and it couldn't be developed." Seeley stated that Outlot B

5

"cannot be developed, can never be developed." During the meeting, Seeley became angry because Mr. Bershader continued to "press" him about the meaning of the designation "preserved land." According to Mr. Bershader, Seeley "almost got into a rage. . . . He said what are you afraid of, [Outlot B has] been tested, we've tested it, we've tested it, it — it can't be developed, it's preserved land, what the hell are you afraid of."

James Koutris purchased Lot 24 in the Bennett Farms subdivision. Lot 24 is also adjacent to Outlot B. Koutris testified that Nancy Brown informed him that Outlot B was "preserved land" and that a house could not be constructed on that lot because "it did not perk." Brown gave Koutris a brochure which indicated that Outlot B was "preserved land."

Unbeknownst to the Bershaders, water percolation tests had not been performed on Outlot B, and Prospect Development had always intended to construct a house on Outlot B. Even though Prospect Development and its representatives repeatedly informed prospective buyers in 1993 that a house could not be constructed on Outlot B, Seeley conceded that at the time he told the Bershaders that Outlot B "would not perk," he knew that no water percolation tests had been performed. He admitted that all percolation tests on Outlot B were conducted after the sale of Lot 23 to the Bershaders. William Vermilye,

6

an employee of the Fairfax County Health Department, testified that no water percolation tests were performed on Outlot B until 1996.

The Bershaders also did not know that according to the tax records of Fairfax County Department of Tax Administration, Outlot B was classified as "B" which meant for purposes of Fairfax County's tax records, the lot was "a buildable lot."  Brown testified that she was surprised when she later learned that Prospect Development had designated Outlot B as a buildable lot.

The Bershaders signed a contract to purchase Lot 23 with improvements thereon for $500,000.  The purchase price included a lot premium of $15,000 because Lot 23 was adjacent to Outlot B, which was "preserved land."  The designation of Outlot B as "preserved land" was an integral part of the Bershaders' decision to purchase Lot 23.

The Bershaders closed on Lot 23 in October 1993.  A house, constructed on that property, was situated so that the Bershaders would have an optimal view of the "preserved land." The Bershaders expended approximately $115,000 for landscaping "to naturalize their entire lot to match the 'preserved land'" on Outlot B.  They spent an additional $67,000 to create a "park-like" atmosphere on their lot.  The chancellor found

that the Bershaders built a house with the natural environment they desired.

In March 1997, the Bershaders and other residents of the Bennett Farms subdivision learned Prospect Development had submitted a resubdivision plat to Fairfax County, and Prospect Development sought to "resubdivide" Outlot B so that a house could be constructed upon that lot. The County approved Prospect Development's request over the Bershaders' written objections and, in May 1997, Prospect Development's agents began to remove trees from Outlot B in preparation for construction. The Bershaders obtained a temporary injunction from the chancellor which prohibited Prospect Development from disturbing the lot until further order of the court.

Following the ore tenus hearing, the chancellor issued a written opinion. The chancellor specifically found that "Seeley's credibility as a witness [was] poor. His testimony was disingenuous at times, particularly when he attempted to distinguish between statements made in his individual capacity as opposed to his statements or actions taken by Prospect, of which he was Vice President. In testimony which the [chancellor] found to be incredible, Seeley denied that he had personally referred to Outlot B as 'preserved land' in conversations with the Bershaders, but did not deny that Prospect had referred to Outlot B as 'preserved land.' The

8

[chancellor] also found that Seeley manifested a cavalier attitude about lying to prospective purchasers and lenders."

## IV.  BREACH OF CONTRACT

The defendants argue that the chancellor erred in holding that Prospect Development breached its real estate sales contract with the Bershaders.  The defendants contend that the Bershaders' evidence of the representations of Prospect Development's agents regarding Outlot B was inadmissible. Continuing, the defendants assert that the contract contains (1) no reference to Outlot B and (2) an integration clause which provides that in the absence of an amendment in writing, the contract contains the final and entire agreement between the parties.  Responding, the Bershaders contend that the phrase "premium lot" is ambiguous and, therefore, parol evidence was admissible to explain the meaning of this phrase. We agree with the Bershaders.

The Bershaders and Prospect Development executed a contract for the sale of real property and the improvements thereon for a price of $500,000.  Paragraph 3 of the contract states in part:  "IMPROVEMENTS AND OPTIONS.  Sales price to include a house built by SELLER known as Rosewood Elevation "D" together with the following optional extras:   . . . premium lot . . . ."

9

The real estate sales contract did not define the term "premium lot." The chancellor properly allowed the admission of parol evidence so that the parties could explain the meaning of this term. As we have stated:

> "[I]t is equally as elementary that the [parol evidence] rule does not apply where the writing on its face is ambiguous, vague or indefinite or does not embody the entire agreement. In such a case, parol evidence is always admissible, not to contradict or vary the terms, but to establish the real contract between the parties."

Georgiades v. Biggs, 197 Va. 630, 634, 90 S.E.2d 850, 854 (1956); see e.g. Cascades N. Venture, Ltd. Partnership v. PRC, Inc., 249 Va. 574, 579, 457 S.E.2d 370, 373 (1995).

Our review of the evidence of record clearly demonstrates that the lot that the Bershaders purchased was described as a "premium lot" because it was adjacent to "preserved land." For example, Seeley told the Bershaders that if they did not wish to pay $15,000 for a premium lot, Prospect Development would construct a house on another lot that would not be adjacent to "preserved land."

It is true, as the defendants assert, that the real estate sales contract contains an integration clause. However, the integration clause does not prohibit the admission of parol evidence which does not contradict or vary

10

the terms of the real estate contract, but rather explains the meaning of the term "premium lot."[1]

## V. ACTUAL FRAUD

The defendants argue that the evidence is not sufficient to support the chancellor's finding that they committed acts which constituted actual fraud. The Bershaders argue, and we agree, that there is more than sufficient evidence to support the chancellor's finding of actual fraud.

We have stated that a "litigant who prosecutes a cause of action for actual fraud must prove by clear and convincing evidence: (1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled." Bryant v. Peckinpaugh, 241 Va. 172, 175, 400 S.E.2d 201, 203 (1991); Winn v. Aleda Constr. Co., 227 Va. 304, 308, 315 S.E.2d 193, 195 (1984). We hold, as shown by the evidence summarized in Section III of this opinion, that the Bershaders proved by clear and convincing

---

[1] We do not consider the defendants' argument that the Bershaders' breach of contract claim is unenforceable because of the statute of limitations and the statute of frauds. These contentions are not the subject of the defendants' assignment of error which states: "The Circuit Court erred in finding that Prospect Development Company, Inc. breached its sales contract with Steven Bershader and Marguerite Godbold." Rule 5:27.

evidence each of the elements necessary to establish a cause of action for actual fraud.

The defendants repeatedly told the Bershaders that: percolation tests were performed on Outlot B, the percolation tests were not successful, the lot was designated as "preserved land" and, therefore, a house could never be constructed upon the lot. The defendants assert that these statements cannot support an action for actual fraud because the statements are merely assertions about future events. The defendants' contention is without merit. Certainly, the defendants' statements that percolation tests had been performed on Outlot B and those tests were not successful are neither opinions nor statements about future events.

## VI. CONSTRUCTIVE FRAUD

The defendants assert that the Bershaders failed to prove constructive fraud by clear and convincing evidence. Essentially, the defendants contend that any statements the Bershaders relied upon are opinions and statements of future events, not preexisting facts. We disagree with the defendants' contentions.

In Blair Constr., Inc. v. Weatherford, 253 Va. 343, 346-47, 485 S.E.2d 137, 138-39 (1997), we stated:

> "'[T]he elements of a cause of action for constructive fraud are a showing by clear and convincing evidence that a false representation of a

12

material fact was made innocently or negligently, and the injured party was damaged as a result of his reliance upon the misrepresentation. Evaluation Research Corp. v. Alequin, 247 Va. 143, 148, 439 S.E.2d 387, 390 (1994); accord Nationwide Mut. Ins. Co. v. Hargraves, 242 Va. 88, 92, 405 S.E.2d 848, 851 (1991); Kitchen v. Throckmorton, 223 Va. 164, 171, 286 S.E.2d 673, 676 (1982). Additionally, "[a] finding of . . . constructive fraud requires clear and convincing evidence that one has represented as true what is really false, in such a way as to induce a reasonable person to believe it, with the intent that the person will act upon this representation." Alequin, 247 Va. at 148, 439 S.E.2d at 390.' Mortarino v. Consultant Eng. Services, 251 Va. 289, 295, 467 S.E.2d 778, 782 (1996).

"Additionally, 'fraud must relate to a present or a pre-existing fact, and cannot ordinarily be predicated on unfulfilled promises or statements as to future events.' Patrick v. Summers, 235 Va. 452, 454, 369 S.E.2d 162, 164 (1988) (quoting Soble v. Herman, 175 Va. 489, 500, 9 S.E.2d 459, 464 (1940))."

We will not restate the evidence summarized in Section III of this opinion. We hold that the Bershaders proved each of the elements of constructive fraud by clear and convincing evidence.

Additionally, the defendants' statements that Prospect Development had conducted water percolation tests on Outlot B and such tests were not successful are neither opinions nor statements of future events. Rather, these representations are factual statements. Furthermore, the statement that Outlot B failed to pass a water percolation test is an unambiguous representation of the present quality or character

13

of the property and, thus, is a representation of fact, and
not a mere expression of opinion.  See Mortarino, 251 Va. at
294, 467 S.E.2d at 781; see also Bergmueller v. Minnick, 238
Va. 332, 337, 383 S.E.2d 722, 724 (1989).

## VII.   EASEMENT BY ESTOPPEL

The chancellor, applying Oney v. West Buena Vista Land
Co., 104 Va. 580, 584, 52 S.E. 343, 344 (1905), held that the
Bershaders established that they have a negative easement that
had been created by estoppel, and the chancellor entered a
decree that required Prospect Development to record the
easement in favor of the Bershaders in the chains of title to
Lot 23 and Outlot B.  The chancellor also entered an
injunction to enforce the easement.  The defendants argue that
the chancellor erred because an easement by estoppel cannot be
created based upon the evidence of record.  We disagree.

We have stated that an easement is "a privilege without
profit, which the owner of one tenement has a right to enjoy
in respect of that tenement in or over the tenement of another
person; by reason whereof the latter is obliged to suffer, or
refrain from doing something on his own tenement for the
advantage of the former."  Stevenson v. Wallace, 68 Va. (27
Gratt.) 77, 87 (1876).  We have also stated:

> "'Easements correspond to the servitudes of the
> civil law, and consist (1) of privileges on the part
> of one person to use the land of another (the

14

servient tract) in a particular manner and for a particular purpose, or (2) of rights to demand that the owner of the servient tract refrain from certain uses of his own land, the privileges or rights in either case not being inconsistent with a general property in the owner of the servient tract. The easement further involves the right of freedom in its exercise from interference by the owner of the servient tract or other persons. Examples of easements are rights of way, of drainage, or light and air, etc.' [Footnotes omitted] 1 Minor on Real Property (2d Ed., Ribble), § 87."

Bunn v. Offutt, 216 Va. 681, 684, 222 S.E.2d 522, 525 (1976) (emphasis added); Walters v. Smith, 186 Va. 159, 172, 41 S.E.2d 617, 623 (1947).

We have recognized that "[e]asements may be created by express grant or reservation, by implication, by estoppel or by prescription." Bunn, 216 Va. at 684, 222 S.E.2d at 525 (emphasis added). We have specifically applied the doctrine of an easement by estoppel in at least two instances. In the first instance, we held that a property owner had an easement by estoppel to use an alley owned by another. Walters, 186 Va. at 173, 41 S.E.2d at 624. In doing so, we stated:

> "'Easements are sometimes created by estoppel; for example, if the vendor of land actually or constructively makes representations as to the existence of an easement appurtenant to the land sold to be enjoyed in land which the vendor has not sold. Thus, where a vendor describes the land sold as bounded on a street described as running through the vendor's unsold land, the vendor is, as against his vendee, (though not necessarily as against the public, or third persons), estopped to deny the existence of such a street, the conveyance practically creating a private right of way over the

15

> vendor's land along the <u>route</u> described in favor of the grantee.'"

<u>Id.</u> at 172, 41 S.E.2d at 623.

In the second instance, we considered whether certain property owners had an easement by estoppel to use a bridge. <u>Oney</u> v. <u>West Buena Vista Land Co.</u>, <u>supra</u>. The appellee, a landowner, subdivided a large tract into blocks, lots, streets, and alleys and recorded a plat which showed a bridge which connected the streets of the subdivision with the streets of the town of Buena Vista, across a stream. J. L. Oney purchased a mill shown on the plat, and he paid approximately double the amount the property would have been worth without the designation on the plat of the bridge. 104 Va. at 581-82, 52 S.E. at 343.

After construction of the bridge, Oney and other property owners in the subdivision, as well as the public, used the bridge for many years. Subsequently, the bridge needed repair, and Oney and others subscribed to a fund to repair the bridge. West Buena Vista sold the bridge, and the purchasers began to demolish it. Oney sought a bill in equity to enjoin the removal of the bridge. 104 Va. at 582-83, 52 S.E. at 344.

Reversing a decree which dismissed Oney's bill, we held that under these circumstances, Oney had an easement to use the bridge. We stated that it would be "manifestly unjust to

permit [the land company], after having used this bridge as an inducement to [Oney] and others to buy its property, and permitted its use as stated, to remove [the bridge] and thereby deprive these purchasers of a valuable and indispensable easement to their property." 104 Va. at 586, 52 S.E. at 345. We observed in Jones v. Beavers, 221 Va. 214, 219, 269 S.E.2d 775, 778 (1980), that this Court applied principles of estoppel in holding that Oney owned an easement to use the bridge.

We have never had occasion to apply an easement by estoppel to the second class of easements described earlier as "rights to demand that the owner of the servient tract refrain from certain uses of his own land." Bunn, 216 Va. at 684, 222 S.E.2d at 525. This is an easement in which the owner of the servient tract agrees to refrain from certain uses of his land. One commentator has described this type of easement, referred to as a negative easement, as follows:

> "[A] negative easement consists solely of a veto power. The easement owner has, under such an easement, the power to prevent the servient owner from doing, on his premises, acts which, but for the easement, the servient owner would be privileged to do. Thus, such an easement may assure its owner access of light to his windows or to a solar energy device from the servient land, by giving the owner power to prevent the creation on the servient land of structures obstructing such access . . . ."

17

4 Richard R. Powell, Powell on Real Property § 34.02[2][c] (Patrick J. Rowan, ed. 1998). Thus, a negative easement does not bestow upon the owner of the dominant tract the right to travel physically upon the servient estate, but rather requires that the owner of the servient estate refrain from undertaking certain activities on the servient estate which the owner would otherwise be entitled to perform.

We hold that the Bershaders have established that they have a negative easement in Outlot B, created by principles of estoppel arising from the representations and inducements of Prospect Development's agents. Here, just as in Oney, it would be manifestly unjust to permit Prospect Development to construct a house upon Outlot B. Relying upon the defendants' numerous representations and inducements that Outlot B would always remain as "preserved land," and that "there was no possibility" a house would be constructed on Outlot B, the Bershaders paid $500,000 to purchase Lot 23 with a house constructed thereon to enjoy the view and privacy afforded by Outlot B's status as "preserved land."

We have recognized that there are two classes of easements, easements appurtenant and easements in gross. An easement appurtenant, often referred to as a pure easement, has both a dominant and servient estate and is capable of being transferred and inherited. Lester Coal Corp. v. Lester,

18

203 Va. 93, 97, 122 S.E.2d 901, 904 (1961). "Such an easement passes with the land to which it is appurtenant." Id. An easement in gross, sometimes called a personal easement, is not appurtenant to any estate in land, but, rather, "the servitude is imposed upon land with the benefit thereof running to an individual. Such an easement cannot be transferred by the individual to whom it is originally given, nor can it pass by inheritance." Id. We have held that "[a]n easement is never presumed to be merely personal, and it will not be held to be in gross, unless it plainly appears that the parties so intended." Id.

Applying these principles here, we hold that there is no evidence in the record before this Court that the Bershaders' easement, created by principles of estoppel, was intended to be an easement in gross. Thus, the Bershaders' easement is appurtenant and "passes with the land."

The defendants assert that the Bershaders do not have an ownership interest in Outlot B, and they do not have the right "to set foot on Outlot B . . . [and the] deed conveyed no rights in Outlot B." However, these facts do not defeat the Bershaders' easement by estoppel. As we have already stated, an easement may prohibit the owner of the servient estate from performing certain acts upon that estate. Bunn, 216 Va. at 684, 222 S.E.2d at 525.

19

We reject the defendants' assertion that the creation of an easement by estoppel under the facts and circumstances of this case is violative of the statute of frauds. The statute of frauds "will not be applied when the result is to cause a fraud or perpetrate a wrong, because the object of the statute is to prevent frauds." Drake v. Livesay, 231 Va. 117, 120, 341 S.E.2d 186, 188 (1986); Murphy v. Nolte & Co., 226 Va. 76, 81, 307 S.E.2d 242, 245 (1983).

## VIII. COMPENSATORY DAMAGES

The chancellor awarded the Bershaders damages in the amount of $34,000 which represented the costs of replacing trees that the defendants had removed from Outlot B before the chancellor issued the temporary injunction. The defendants contend that the chancellor erred in awarding the Bershaders $34,000 in damages.[2] The Bershaders respond, however, that the chancellor properly awarded them damages based upon the loss of the trees removed from Outlot B. We disagree with the Bershaders.

Generally, a person who acquired property by virtue of a commercial transaction and who has been defrauded by false

---

[2] The chancellor stated in his written opinion that: "The Bershaders requested compensatory damages in the amount of $500,000 and punitive damages in the amount of $350,000. The Court finds that an additional monetary award of compensatory damages is not necessary given the relief awarded by the Court."

20

representations is entitled to recover as damages the difference between the actual value of the property at the time the contract was made and the value that the property would have possessed had the representation been true. See Carstensen v. Chrisland Corp., 247 Va. 433, 444-45, 442 S.E.2d 660, 666-67 (1994); Long & Foster Real Estate, Inc. v. Clay, 231 Va. 170, 176, 343 S.E.2d 297, 301 (1986); see also Restatement (Second) of Torts § 549 (1992).

The Bershaders, however, did not present evidence which established the difference between the value of Lot 23 at the time they executed the real estate sales contract and the value of Lot 23 had it been adjacent to "preserved land." Rather, the Bershaders presented the testimony of William C. Harvey, II, who qualified as an expert on the subject of land valuation and appraisal. He testified that the market value of the Bershaders' property decreased after the trees were removed from Outlot B. His opinion, however, was based upon the cost of replacing the trees that the defendants had removed from Outlot B.

We have not permitted this measure of damages in a fraud case, and we decline to do so in this case. As we have recognized in condemnation proceedings, which we acknowledge are vastly different from actions for constructive or actual fraud, the replacement cost rule could permit a landowner to

recover compensation which far exceeds the value of the real property.  See State Highway Comm'r v. Allmond, 220 Va. 235, 239, 257 S.E.2d 832, 834-35 (1979); State Highway Comm'r v. Parr, 217 Va. 522, 524-25, 230 S.E.2d 253, 255 (1976).

IX.  ATTORNEY'S FEES

The Bershaders incurred and paid $151,378 in attorney's fees.  The chancellor awarded them $151,378 for their incurred attorney's fees and $20,000 for future attorney's fees the Bershaders were expected to incur in their efforts to satisfy the judgment.  The defendants argue that the chancellor erred in awarding attorney's fees in a suit based upon common law doctrines of fraud, estoppel, and breach of contract.  The defendants contend that the Bershaders have failed to identify any contract or statute which provides for the payment of their attorney's fees, and in the absence of such authorization, the chancellor cannot make an award of attorney's fees.  Responding, the Bershaders contend that the chancellor was entitled to grant them complete relief, which included an award of attorney's fees.

The general rule in this Commonwealth is that in the absence of a statute or contract to the contrary, a court may not award attorney's fees to the prevailing party.  Gilmore v. Basic Industries, Inc., 233 Va. 485, 490, 357 S.E.2d 514, 517 (1987).  There are, however, certain exceptions to this rule.

22

For example, we have permitted a prevailing party, who prosecuted a cause of action for malicious prosecution or false imprisonment, to recover attorney's fees. Burruss v. Hines, 94 Va. 413, 420, 26 S.E. 875, 878 (1897); Bolton v. Vellines, 94 Va. 393, 404, 26 S.E. 847, 850 (1897).

We have held that "where a breach of contract has forced the plaintiff to maintain or defend a suit with a third person, he may recover the counsel fees incurred by him in the former suit provided they are reasonable in amount and reasonably incurred." Owen v. Shelton, 221 Va. 1051, 1055-56, 277 S.E.2d 189, 192 (1981); accord Fidelity Nat. Title Ins. Co. v. Southern Heritage Title Ins. Agency, Inc., 257 Va. 246, 253-54, 512 S.E.2d 553, 557-58 (1999); Hiss v. Friedberg, 201 Va. 572, 577-78, 112 S.E.2d 871, 875-76 (1960). We have permitted a trustee, who defended his trust in good faith, to recover attorney's fees from the estate, Cooper v. Brodie, 253 Va. 38, 44, 480 S.E.2d 101, 104 (1997), and we have approved an award of attorney's fees in certain cases involving alimony and support disputes even though such awards of attorney's fees were neither authorized by statute nor by contract. See Carswell v. Masterson, 224 Va. 329, 331-32, 295 S.E.2d 899, 900-01 (1982); Alig v. Alig, 220 Va. 80, 86, 255 S.E.2d 494, 498 (1979); McKeel v. McKeel, 185 Va. 108, 116-17, 37 S.E.2d 746, 750-51 (1946); McClaugherty v. McClaugherty, 180 Va. 51,

69, 21 S.E.2d 761, 768 (1942); Heflin v. Heflin, 177 Va. 385, 399-400, 14 S.E.2d 317, 322 (1941).

We hold that in a fraud suit, a chancellor, in the exercise of his discretion, may award attorney's fees to a defrauded party.  When deciding whether to award attorney's fees, the chancellor must consider the circumstances surrounding the fraudulent acts and the nature of the relief granted to the defrauded party.  Here, the chancellor did not abuse his discretion in awarding attorney's fees incurred and paid by the Bershaders which, in this instance, total $151,378.  The evidence of record, summarized in Section III of this opinion, demonstrates that the defendants engaged in callous, deliberate, deceitful acts that the chancellor described as a pattern of misconduct, which misled the Bershaders as well as other purchasers of property in the subdivision.  Indeed, had the chancellor failed to award attorney's fees to the Bershaders, their victory would have been hollow because, as the chancellor observed:

> "I'm simply unable to see the equity involved in [holding that the defendants] actually defrauded [the Bershaders but they are] going to have to spend . . . over $171,000 in attorneys' fees . . . .  To say that this case was hotly contested by the defendants I think is something of an understatement.  It was certainly hotly contested in all respects by the defense.  And it was not a precise, surgical defense in this case.  It was a global, comprehensive, all inclusive — basically defend everything and deny everything.  And I'm not

by saying that faulting the attorneys.  That was the
position taken by the defendants themselves. . . .
It did take an enormous amount of effort by the
complainants to prove their case in this situation."

The defendants also argue that the chancellor erred
because he awarded the Bershaders $20,000 in attorney's fees
which were the estimated costs of collection of the judgment
"without regard to whether the services were successful,
necessary or even proper."  Continuing, the defendants point
out that the "entire judgment of $205,378 has now been secured
by a cash [appeal] bond which [has] been paid into the Circuit
Court.  There will be no costs of collection of any portion of
the judgment that may be affirmed."  The Bershaders do not
respond to this assertion.

We hold that the chancellor erred by awarding the
Bershaders $20,000 in anticipated attorney's fees for
collection of the judgment.  The defendants have secured a
cash appeal bond which has been paid into the circuit court
and, hence, the Bershaders will not incur those attorney's
fees.

## X.  PAUL LUCAS

Paul Lucas, who was named as a defendant in the amended
bill of complaint but is not an appellant in this proceeding,
filed a suggestion of bankruptcy in December 1997.  The filing
of the bankruptcy petition operated as an automatic stay

25

against the continuation of the circuit court proceeding against him. See 11 U.S.C. § 362(a)(1) (1993). The chancellor, however, entered a judgment against Prospect Development, Seeley, and Lucas, jointly and severally. Defendants, Prospect Development and Seeley, argue on appeal that the chancellor erred in rendering a judgment against Lucas. We do not consider this issue because Prospect Development and Seeley cannot assert this issue on behalf of Lucas, who is not a party to this appeal.

## XI. DIRECTIONS

We will affirm those portions of the chancellor's decree which hold that the defendants breached the real estate sales contract with the Bershaders and that the defendants committed actual and constructive fraud. We will affirm that portion of the decree which establishes that the Bershaders have a negative easement in Outlot B. We will also affirm that portion of the decree which grants permanent injunctive relief and requires Prospect Development to record an easement in favor of the Bershaders in the chains of title to Lot 23 and Outlot B. We will reverse that portion of the decree that awards damages of $34,000 to the Bershaders. We will modify the decree to reduce the award of attorney's fees from $171,378 to $151,378. Since the defendants have not assigned error to the balance of the chancellor's decree, we will

26

affirm all portions of the decree that are not modified or reversed.

<u>Affirmed in part</u>,
<u>reversed in part</u>,
<u>modified in part</u>,
<u>and final judgment</u>.

JUSTICE LACY, with whom CHIEF JUSTICE CARRICO and JUSTICE KINSER join, concurring in part and dissenting in part.

I concur in the majority's opinion except for that portion affirming the trial court's grant of a negative easement by estoppel. Count IV of the bill of complaint alleged that the sales agreement between Prospect Development and the Bershaders provided that Outlot B would not be cleared or developed. The Bershaders alleged that Prospect Development breached this agreement and sought specific performance of the contract. The trial court found that the sales contract was breached and granted specific performance "to the extent" that it found an easement by estoppel, and it awarded permanent injunctive relief to the Bershaders.

I agree with the trial court and the majority that Prospect Development breached its contract and that an award of specific performance and injunctive relief was appropriate; however, under the pleadings and facts of this case, it is unnecessary for this Court to sanction a new cause of action for "negative easements by estoppel" because awarding specific

27

performance of the sales contract and permanent injunctive relief enforces the rights the Bershaders acquired in the purchase of Lot 23 from Prospect Development. Furthermore, in my opinion, the facts of this case are insufficient to support the creation of an easement. Therefore, I respectfully dissent.

In their bill of complaint, the Bershaders alleged that "[t]he parties agreed that as a condition to the purchase of the Property by the Bershaders, the adjoining 'Preserved Land' would not be cleared and/or developed." As evidence of this alleged contractual obligation of Prospect Development, the Bershaders offered the "New Home Agreement of Sale." The agreement provides that the sale price would "include a house built by SELLER known as ROSEWOOD ELEVATION "D" together with the following optional extras: . . . PREMIUM LOT . . . ." Finding that the term "premium lot" was ambiguous, the trial court properly admitted parol testimony to clarify that term. The parol testimony established that the Bershaders paid an additional $15,000 in return for the promise that Prospect Development would not develop Outlot B. Thus, the sales agreement, as clarified by parol testimony, contains a *written* promise with respect to the use of land that Outlot B would not be developed by Prospect Development. Such a promise is specifically enforceable and should be enforced in this case.

28

The easement created by the trial court and affirmed by the majority was based on this contract as well as oral representations made by Prospect Development.  In my opinion, however, neither the contract nor the oral representations relied on by the Bershaders, the trial court, and the majority are sufficient to give rise to an easement, by estoppel or otherwise.  An easement is the right of one person over the use of another's land.  The oral representations in this case — that Outlot B was designated as preserved land because it would not perk and could not be developed — even if true, do not imply or suggest that the *Bershaders* have any right to prevent the development of that parcel.  Rather, these representations reflect that a third party, the government, has utilized its regulatory power to limit use of the land. Any change in the regulations or the extension of a sewer system to the area would affect whether Outlot B would perk or whether it could be developed.  The Bershaders have no right to affect either of these contingencies and, in the event either occurs, the reasons for the preserved lot designation for Outlot B would no longer exist.

In this regard, the designation of Outlot B as preserved land is analogous to the zoning classification of a parcel of land.  A purchaser of land has no right to enforce continuation of a specific zoning classification on an

adjacent parcel.  Unless such purchaser takes measures to secure in himself the right to control the use of a neighboring parcel, the purchaser relies on the zoning classification at his peril.  See Town of Vienna Council v. Kohler, 218 Va. 966, 976, 244 S.E.2d 542, 548 (1978). Therefore, even though the Bershaders were induced to purchase their lot through oral representations that Outlot B was "preserved land" which did not perk and could not be developed, these representations did not give rise to any right in the Bershaders or any owner of Lot 23 to prevent the development of Outlot B.[3]

The right which the Bershaders did acquire to prevent development of Outlot B was the right to enforce the written contract promise not to develop Outlot B against the promisor, Prospect Development.[4]  And, as I said earlier, the trial court, the majority, and I all agree that the Bershaders are entitled to enforcement of this contractual right, in this case through specific performance.[5]

---

[3] These statements, however, as previously discussed were false, and they are the basis for the Bershaders' recovery under their fraud counts.

[4] Because we do not recognize the doctrine of promissory estoppel, an oral promise not to develop the land would be unenforceable due to noncompliance with the Statute of Frauds.

[5] This written promise potentially creates a common law "restrictive covenant," or "promise with respect to the use of land" rather than negative easement. See Jon W. Bruce & James W. Ely, Jr., The Law of Easements and Licenses in Land,

30

In summary, the Bershaders were induced to purchase Lot 23 by the fraudulent representations made by Prospect Development that Outlot B was preserved land because it did not perk and could not be developed and are thus entitled to recover under their fraud counts in their bill of complaint. Prospect Development breached the contract for sale and the Bershaders are entitled to specific performance of the contract. However, in my opinion, the Bershaders are not entitled to an easement by estoppel.

Accordingly, I would reverse the trial court's judgment establishing an easement by estoppel and ordering such easement entered in the chains of title for Lot 23 and Outlot B. I would affirm the permanent injunction issued by the

Easements Differentiated from Real Covenants § 1.07 (rev. ed. 1995). Although similar to an easement in effect, a restrictive covenant arises from a contract rather than from documents of conveyance. See Oney v. West Buena Vista Land Co., 104 Va. 580, 52 S.E. 343 (1905); Walters v. Smith, 186 Va. 159, 41 S.E.2d 617 (1947); Uriel Reichman, Toward a Unified Concept of Servitudes, 55 So. Cal. L.Rev. 1177 (1982). Such a contractual obligation creates in the promisee a property right in the land of the promisor, enforceable by specific performance. Restatement of Property § 522 cmt. b (1944). Furthermore, the burden of such a "restrictive covenant" would be enforceable against Prospect's successors in estate if the party seeking enforcement (the Bershaders or their successors in estate) could establish the elements that it "touches and concerns" the land, that there be horizontal privity, vertical privity, notice, and intent. Restatement of Property §§ 530-537. However, whether the sales contract created a restrictive covenant need not and should not be resolved here because the Bershaders, while seeking

31

trial court against Prospect Development Company, Paul Lucas, and Alan Seeley enjoining them from clearing or developing Outlot B.

enforcement of the sales contract, have not argued that the contract is enforceable as a restrictive covenant.

32