## CIRCUIT COURT OF SHENANDOAH COUNTY

Anthony Scott et al.

v.

Robert J. Karmy et al.

March 30, 2000

Case No. (Chancery) 00-60

BY JUDGE JOHN E. WETSEL, JR.

This case came before the Court on March 29, 2000, for trial on the issue of whether the Defendants have a drainage easement across the Plaintiffs' property, and if so, the nature and extent of that easement. The parties appeared with their counsel, all of the prefiled exhibits were admitted, evidence was heard, the Court viewed the property, and the case was argued. Upon consideration whereof, the Court has made the following decision.

### I. *Findings of Fact*

The following facts are found by the greater weight of the evidence.

By Deed of Assumption dated January 28, 1997, the Plaintiffs purchased "Lot 6, Lakeview Farms Development, Section 3, further shown on a plat prepared by Fred S. Price, Land Surveyor, Patton Harris Rust & Associates, P.C., dated 4/17/95 and recorded in Deed Book 736, at Page 289, among the land records of Shenandoah County, Virginia." Defendants' Exhibit 1. Lot 6 is improved by a townhouse, which is part of a complex of townhouses.

There is a water drainage problem along the rear of the Lots 4 and 5, and the Defendants, claiming that they have an easement, want to enter the Plaintiffs' property and regrade a drainage swale along the west side and rear of the Plaintiffs' lot in the 10 foot easement area shown on the plat which was appended to the deed to the Plaintiffs' predecessor in title.

The Plaintiffs have filed this suit for an injunction to restrain the Defendants from entering their property, and the Defendants have filed a cross-bill seeking an injunction to enter the property and to recover their costs of this suit and the costs of restoring the land to its contours prior to the Plaintiffs' constructing their fence and regrading their lot.

The Plat at Deed Book 736, Page 289, which was appended to the deed to the Plaintiffs' predecessor in title clearly shows a ten foot drainage easement on the front, back, and west side boundary lines of the Plaintiffs' lot, and a note on the plat refers to an existing drainage easement in Deed Book 693, Page 750. Defendants' Exhibit 2.

The Final Plat of Lakeview Farms Development Section 3 is recorded in Deed Book 693, Page 750. While this plat does not show an easement along the west side of Lot 6, there is a note on the bottom left corner of the plat, which states "A 10' utility and drainage easement is reserved on the front, rear, and side (end unit lots) lot lines." Both Lot 6, which is the Plaintiffs' lot, and Lot 7 are end unit lots, because they are each at the end of their respective block of townhouse units, so the center line of the drainage easement is coterminous with the boundary line between Lots 6 and 7. Accordingly, the area within the drainage easement is actually twenty feet wide along the common boundary between Lots 6 and 7.

According to the original design, the watershed for water flowing along the rear lot lines of the townhouse complex is at the rear boundary of lots 6 and 7. According to the original design for the drainage of surface water, water was to flow from Lot 6 to Lot 1 and from Lot 7 to Lot 11 in the drainage easement at the rear of the lots; water was also to flow from southeast to northwest along the common boundary between Lots 6 and 7 towards the street.

When the townhouse complex was constructed, the rear down spouts were diverted to an underground pipe which runs along the rear of the patios and rainwater in this pipe flows from Lot 1 to the property line between Lot 6 and 7, where it exits into the drainage easement between Lots 6 and 7. The entry of this volume of downspout water into the drainage system can be expected to substantially increase the storm water flow from the point of exit to the street.

The grades for the townhouse complex as built bare little semblance to the original design for the water diversion, and the water flow at the rear of the lots is substantially different from that contemplated in the original plan. In very heavy rains, water occasionally ponds at the rear of Lots 4 and 5 (Defendants' Exhibits 7 and 8), and to correct that problem, the Developer proposes to grade a swale from Lot 4 across Lots 5 and 6 to the boundary

between Lots 6 and 7. There is a transformer on a concrete pad in the ten foot utility easement at the rear of Lot 6, which compounds the problem because it interferes with the construction of the swale. The contemplated swale on Lot 6 will vary in width from about four feet to ten feet in width, and its maximum depth would be 6 to 10 inches.

The area to be drained by the proposed swale at the rear of Lots 4 to 6 is not great, because the total area in the three backyards of those lots is only about 3000 square feet.

In 1996, Mr. Hardy, who then owned Lot 6, added about a dump truck load of dirt to the rear yard of Lot 6, raising the level of the rear yard of Lot 6 by about 3 to 4 inches.

The Owner of Lot 3 has also improved and fenced his rear yard. There is a large maple tree near the southeast corner of Lot 3, and that tree is the high point along the rear line of Lots 1 to 6. Water on the east side of the tree flows generally from the tree in a northeast direction in the drainage easement at the rear of Lots 2 and 1. Water on the west side of the maple tree flows southwest along the rear drainage easement onto Lots 4 and 5.

After occupying Lot 6, the Plaintiffs constructed a fence paralleling the side and rear boundaries of Lot 6. The fence which the Plaintiffs constructed encroaches onto the 10 foot drainage and utility easement area.

In 1997-98, an apartment complex was built on the property which adjoins the rear of the Townhouse complex, and since that time less water flows onto the rear of Lots 1 to 6.

The first page of the Declaration of Covenants and Restrictions recorded in Deed Book 668, Page 153, specifies that Defendants Judy P. Cooper and Robert J. Karmy are referred to in the Declaration as "Declarant." Defendants' Exhibit 5.

Article 3 of the Declaration deals with Easements. Section 3.2 of the Declaration provides for easements in the "Common Area," which is defined in the Declaration Section 1.1(5) to mean "all the Property, other than any Lot(s), then owned by the Association." Exhibit 5, page 157. "Property" is defined in Section 1.1(13) to mean "the real estate then subject to this Declaration and includes all improvements and appurtenances thereto now or hereafter existing." Defendants' Exhibit 5, page 158. While Plaintiffs' Lot 6 is part of the "Property," it is not part of the "Common Area"; therefore, Section 3.2 of the Declaration does not apply to the drainage and utility easement across Lot 6.

Article 3.5 of the Declaration deals with utility easements, and it states:

Section 3.5. *Utilities*. The Property is hereby made subject to an easement for the provision to any portion(s) of the Property of all utilities, including (without limitation) water, sewers and drain systems, electricity, gas, telephone, and paid subscription television service. Any pipes, conduits, lines, wires, transformers and any other apparatus useful for the provision or metering of any utility may be installed, maintained or relocated where initially installed with the permission of the Declarant, where contemplated on any site plan approved by the Declarant, or where approved by resolution of the Board of Directors. The right is hereby reserved to the Declarant, as long as the Declarant is an Owner, and to the Association thereafter, to grant permits, licenses and easements over and through any portion(s) of the Property, regardless of the ownership thereof at the time such easements are granted, for utilities and other purposes reasonably necessary or useful for the benefit or upkeep of the Property or any portion(s) thereof.

This is the provision which applies to the easement in question.

Section 6.3 of the Declaration states:

*Improvements and Exterior Changes*. Except pursuant to and in accordance with a resolution of the Board of Directors, a resolution of any Architectural Control Committee created pursuant to the Bylaws, or a permissive provision of the Rules and Regulations of the Association, no person shall do anything which would change the exterior appearance of any portion of a Lot, or (without limiting the generality of the foregoing):

1. Construct or place any improvement or structure of a temporary or permanent character anywhere on the Property . . . .

Defendants' Exhibit 5, page 167.

Section 9.2 of the Declaration provides that:

each Owner has the right to enforce by any proceeding at law or in equity every provision of the Association Documents, and to seek and obtain any and all relief which may be appropriate in the circumstances of each case. A prevailing Plaintiff in any such proceeding shall be entitled to have his Court costs and reasonable attorneys' fees reimbursed by the Defendant(s), together with any

Court costs and reasonable attorneys' fees incurred in enforcing this right.

Defendants' Exhibit 5, page 177.

## II. *Conclusions of Law*

Easements are created either by express grant or reservation or by implication. *Prospect Dev. Co. v. Bershader*, 258 Va. 75, 87, 515 S.E.2d 291 (1999). In this case an easement was created by express reservation.

Since the Town approved the townhouse project and signed the plat, see Defendants' Exhibit 3, any drainage easement shown on that plat would be transferred to the Town pursuant to Virginia Code § 15.1-478, now § 15.2-2265. *See Burns v. Board of Supvrs.*, 226 Va. 125, 130, 312 S.E.2d 731 (1984). However, the statute expressly provides that "Nothing in this section shall obligate the locality . . . to install or maintain such facilities unless otherwise agreed to by the locality . . . ." There was no evidence that the Town had agreed to install or maintain the facilities, so that is still the responsibility of the Developer.

Section 3.2 of the Declaration of Covenants and Restrictions for Seven Bends Townhouses was a provision by which the developer reserved easements across the "Common Area." Common Area is defined in the Declaration Section 1.1(5) to mean "all the Property, *other than any Lot(s)*, then owned by the Association." (Emphasis added.) The platted lots are not part of the Common Area of the townhouse development, so section 3.2 has no application to the case before the Court.

Section 3.5 of the Declaration of Covenants and Restrictions for Seven Bends Townhouses provides that the "Property is hereby made subject to an easement . . . ." The Declaration of Covenants and Restrictions for Seven Bends Townhouses § 1.1(13) defines "Property" to mean "the real estate then subject to this Declaration and includes all improvements and appurtenances thereto now or hereafter existing." Defendants' Exhibit 5, page 158. This definition includes Lot 6 and the other lots within the development, so lot 6, like the other platted lots, is subject to the easements set forth in Section 3.5 of the Declaration, which states in pertinent part that:

Section 3.5. *Utilities.* The Property [which includes the Plaintiffs' lot 6] is hereby made subject to an easement for the provision to any portion(s) of the Property of all utilities, including (without limitation) sewers and drain systems . . . . Any pipes . . . may be installed,

maintained or relocated where initially installed with the permission of the Declarant, where contemplated on any site plan approved by the Declarant, or where approved by resolution of the Board of Directors. The right is hereby reserved to the Declarant, as long as the Declarant is an Owner, and to the Association thereafter, to grant permits, licenses and easements over and through any portion(s) of the Property, regardless of the ownership thereof at the time such easements are granted, for utilities and other purposes reasonably necessary or useful for the benefit or upkeep of the Property or any portion(s) thereof.

This is a very broad reservation to the Declarants, who are the Defendants in this suit, and it reserves to them a general right of entry to provide a broad range of utilities to the Property. One of the stated purposes of the easement is for "sewers and drains," the two nouns are joined by the conjunction "and," so the two are different things.

Like many terms drains has become a subject of legal discussion, and there is an entire chapter in Am. Jur. 2d devoted to it. In 25 Am. Jur. 2d, *Drains and Drainage Districts*, § 1, the editors state:

Having no technical meaning, the words "drain" and "ditch" commonly signify a natural or artificial hollow in the ground where water is collected or drained away. A "drain" denotes an artificial channel or drainage through which water or sewage is caused to flow.

Since Section 3.5 speaks of "sewers and drains," it is clear that the Declaration uses the term "drain" to "signify a natural or artificial hollow in the ground where water is collected or drained away." Therefore, the Developers reserved to themselves the general right to grant easements for utilities, like storm water drains, which are reasonably necessary for the use and preservation of the townhouse development.

The April 17, 1995, plat appended to the deed plaintiffs' predecessors in title showed an existing ten foot easement along the front, side, and rear of Lot 6, which was designated "Ex 10' Utility and Drainage Esmt DB 693 PG 750." This plat appended to the deed to the Plaintiffs' predecessor in title clearly notified the Plaintiffs that their lot was subject to an existing drainage easement. By conveying the property to the Plaintiffs' successors in title by a deed which shows the "existing utility and drainage easement," the location of this "drainage" easement on Lot 6 has been fixed. Therefore, the general, unlocated drainage easement reserved in Section 3.5 of the Declaration of

Covenants and Restrictions is a specifically located easement insofar as Lot 6 is concerned.

While Section 3.5 mentions "pipes," it is silent about the extent to which the Developer may regrade or alter the contours of the land incident to the installation or maintenance of the drainage system. Since the Declaration is silent, the law implies the terms under which the owner of the dominant estate (Declarant) may exercise his rights under the reserved utility easement. In 25 Am. Jur. 2d, *Easements and Licenses*, § 83, the editors state:

> If an easement claimed under a grant or reservation is not specifically defined, it need only be such as is reasonably necessary and convenient for the purpose for which it was created. . . . Use of the easement includes those uses which are incidental and necessary to the reasonable and proper enjoyment of the easement, but is limited to those that burden the servient estate as little as possible.

Neither Section 3.3 of the Declaration of Covenants and Restrictions for Seven Bends Townhouses or any section of the Declaration restricts the use of that portion of any lot which may be subject to an easement reserved by the Developer. Therefore, as the Supreme Court stated in *Shenandoah Acres, Inc. v. D. M. Conner, Inc.*, 256 Va. 337, 342, 505 S.E.2d 369 (1998):

> Under well-settled principles, a conveyance of an easement that is non-exclusive does not strip the servient landowner of its right to all use of the land. *Walton v. Capital Land, Inc.*, 252 Va. 324, 326, 477 S.E.2d 499, 501 (1996). The servient landowner retains the right to use its property in any manner that does not unreasonably interfere with the lawful dominant use. *Id.* . . .
>
> The party alleging such an unreasonably burdensome or inconsistent use has the burden of proving this allegation. *Hayes v. Aquia Marina, Inc.*, 243 Va. 255, 259, 414 S.E.2d 820, 822 (1992). Any use of a non-exclusive easement may be protected by an injunction prohibiting an interfering use when the harm from the interfering use is irreparable and cannot be adequately addressed in damages. *Black & White Cars, Inc. v. Groome Transp., Inc.*, 247 Va. 426, 431-32, 442 S.E.2d 391, 395 (1994).

The Declaration of Covenants and Restrictions for Seven Bends Townhouses is silent with respect to the right of the lot owner to construct fences within the easement area. As 25 Am. Jur. 2d, *Easements*, § 100 states:

In the absence of an express agreement of a right to maintain gates, it is the general rule that whether the servient owner may erect or maintain gates, bars, or fences across or along the easement depends upon the intention of the parties connected with the creation of the easement, as shown by the circumstances of the case, the nature and situation of the property subject to the easement, and the manner in which the way has been used and occupied.

*Accord Hartsock v. Powell,* 199 Va. 320, 324-25, 99 S.E.2d 581 (1957). In this case the general right to maintain fences is subject to the right of the developer to approve fences and other improvements on the lot.

Whenever two people occupy the same space, there is always the potential for tension arising from the exercise of their respective rights to occupy the same space. In every easement case there is a natural tension between the right of the owner of the dominant estate, in this case the Developer, to use and maintain his easement and the right of the owner of the servient estate, in this case the owner of Lot 6, to use the area within the easement so long as it does not unreasonably interfere with the use by the owner of the dominant estate. In this case, the problem is significantly compounded by the fact the Developer did not grade the townhouse project so that water would drain in accordance with the design documents. See Defendants' Exhibit 6. The utility and drainage easement area contemplates that multiple uses may be made of the easement area, and there is a utility pedestal in the center of the drainage easement at the rear of Lot 6 which further complicates the implementation of a viable solution in this case.

Section 3.5 of the Declaration does not expressly describe the Developer's specific rights to maintain the easement, so the law implies those which are reasonably necessary for the enjoyment of the easement counterbalanced against the fact that these rights must be exercised in a manner that will burden Lot 6 as little as is reasonably possible. Balancing these abstract legal principles in this case produces the following conclusions about the manner in which the Developer may enter the property to construct a drainage facility or swale along the rear and side of Lot 6.

1. The owner of Lot 6, at the owner's expense, will move the rear portion of his fence, so that it is at least 10 feet from his rear lot line and so that it no longer encroaches onto the 10 foot utility and drainage easement along the rear lot line. This will give the Developer a reasonable opportunity to adjust his work to the presence of the utility pedestal.

2. The Developer will prepare a plan, which must be approved by the Town of Woodstock or other proper governmental authority, for the

construction of a drainage swale or facility along the rear of Lots 4, 5, and 6, so that surface water will flow from the rear of those lots, especially Lots 4 and 5, southwesterly along the drainage swale or facility to a drainage swale or drainage facility to be constructed along the common boundary between Lots 6 and 7.

3. If reasonably possible, the portion of the drainage facility or swale to be constructed, which parallels the common boundary between Lots 6 and 7, will be constructed in a manner that will permit the Plaintiffs' existing side fence to remain in its present location, which means that the drainage facility paralleling the side fence will probably occupy the 10 foot easement on Lot 7. However, if it is necessary to move the Plaintiff's fence along the side of Lot 6 in order to construct the drainage swale or facility in accordance with good engineering practices, the cost of removing and relocating the fence and restoration of the ground and reseeding will be done at the Developer's expense. If it determined that it is necessary to move the side fence, it will be moved back such distance as will reasonably accommodate the Developer's work on the drainage facility or swale.

4. From the northwest corner of the Plaintiffs fence to the street, the existing shoulder of the Plaintiffs' lot may be graded to produce a more gradual slope, which means that the drainage swale or facility may then enter Lot 6, but the slope revision must be done in such a manner that the existing cherry tree on the front of Lot 6 may remain. This contemplates that the Plaintiff will have to remove at his expense the row of small arborvitae trees which now parallel the common boundary between Lots 6 and 7.

5. After the Developer has finalized his plan as specified, he will submit it to the Plaintiffs for their review and obtain the Plaintiffs' written consent. If that consent is not obtained, either party may file an appropriate motion with the Court requesting a hearing at a date before the July 7, 2000, hearing date.

6. Any construction must be approved by the requisite governmental authorities as required.

The Temporary Injunction entered in this case on March 17, 2000, is dissolved. This case is continued to July 7, 2000, at 1:00 p.m., at the Joint Judicial Center in Winchester, Virginia, at which time a final decree will be entered, or the Court will hear such further motions as the parties may present. Any motion to be heard on that date must be filed by June 30, 2000.

Considering the decision in this case, each side shall pay their respective attorney's fees and costs.