# CIRCUIT COURT OF FAIRFAX COUNTY

Atocha, L.P., et al.

v.

Witness Tree, L.L.C., et al.

July 16, 2004

Case No. (Chancery) 180921
(consolidated with Chancery Nos. 180896 and 180909)

BY JUDGE KATHLEEN H. MACKAY

The trial in this case was held over the space of three days from March 22 through March 24, 2004. The Court gave the parties an initial ruling from the bench on April 21, 2004, dismissing Respondents Goodwin, Mesrobian, and Song, but taking under advisement the fate of Respondents Mark and Tracey Caraluzzi. This opinion letter represents a more complete statement of the Court's reasoning with regard to all of the Respondents.

The case revolves around the formation of a limited liability corporation (LLC). The Respondents founded the corporation; the Petitioners invested in the corporation. Petitioners allege that the Respondents misled them as to what percentage of the corporation they owned, and that they misled them as to Mr. Caraluzzi's flawed business background. Petitioners allege that these misrepresentations were material and were made knowingly and intentionally. As such, they allegedly violated the Virginia Securities Act, in addition to constituting common law fraud. Petitioners allege constructive fraud in the alternative.

214

For purposes of this litigation the history of the venture can be encapsulated in a short timeframe from the Fall of 1999 through August 2002.

Respondents Mesrobian and Goodwin are doctors, practicing at Fairfax Hospital, who had a taste for fine wine and good food, some money to invest, and an idea that they would appreciate a good restaurant in the Merrifield area of Fairfax County. They met a local businessman, Mark Caraluzzi, who had thirty years of experience owning restaurants, his latest venture being a series of restaurants using the Bistro Bistro name. There were three Bistro Bistro restaurants, the oldest dating from 1987 in Shirlington, a second in Reston, and a third in Ballston. *See*, Pet. Ex. # 9.

The doctors and the restauranteur hit it off and by the Summer of 2000 were seriously discussing the founding of a new restaurant.[1] By January 2001, what began as a restaurant in Merrifield had morphed into an extremely ambitious undertaking in Tyson's Corner, a 10,000 square foot high-end restaurant at the old Fedora's site, an alternative to the expensive but one-note steak houses in the area. *See*, M & G Ex. # 7. Also by January or February, Dr. Song had joined Mesrobian and Goodwin in the venture. Each doctor had agreed to contribute $100,000 to the project.

As of the Fall of 2000, Caraluzzi was drawing a salary, being employed by Witness Tree to bring the project to fruition. He brought Mark Rollinson into the group to act as counsel. Rollinson had a long time professional relationship with Caraluzzi and was completely familiar with the details of Caraluzzi's past restaurant deals. As legal counsel to the LLC, Rollinson was in charge of drafting the documents that defined the LLC. Mark Rollinson was originally a Respondent in these suits, but he died in 2002.

In total, there were six Founding Members: Mesrobian, Goodwin, Song, Rollinson, Caraluzzi, and the latter's wife, Tracey. However, management of all the details, both large and small, of getting the restaurant up and running was delegated to Caraluzzi. He kept the Founders informed and listened to their views but there was no doubt that his was the last word. As an example, in a dispute over the configuration of the bar area with Dr. Song, Caraluzzi's views prevailed.

Caraluzzi did rely upon the doctors to give him the names of potential investors. For an understanding of how the men consulted on issues of restaurant design as well as potential investors, both sides have put into

---

[1] Drinking to the venture over fine wine at a lunch in Georgetown, the men used the wine label as a name for their corporation, hence "Witness Tree." The restaurant was named Restaurant Seven.

evidence Caraluzzi's memoranda to the group. *See*, Pet. Ex. ## 23-26 and M & G Ex. ## 8, 14-18, and 27. *See also*, Transcript, at pp. 274-75.

In performing his duties, Caraluzzi was paid a salary by the LLC and acted as an agent for the LLC. *See*, Transcript, at p. 365. Petitioners have alleged that Caraluzzi was, in fact, an agent for the individual Founding Members. However, no evidence that Caraluzzi had actual or even apparent authority to represent the Founders personally was presented to the Court. Caraluzzi spoke to every potential investor. He was the only one who could answer actual questions about restaurant operations.

Petitioners are three such investors. Atocha is a limited partnership run by Thomas J. Cirrito. Atocha committed $300,000 to the venture in April/May 2001 and another $90,000 in March 2002.[2] Mr. Cirrito is a very experienced, sophisticated businessman and the regular investments he has made on behalf of Atocha often exceed $100,000. He had been chairman and CEO of Long Distance Wholesale Club and, as such, understood how one attracted and enlisted private investors to an enterprise. *See*, Transcript, at pp. 72-73. He was recruited by Caraluzzi.

Jose Pardo-Kronemann (Pardo) is married to a colleague of Dr. Goodwin. Like Cirrito, Pardo was experienced in affairs of finance, albeit from a different point of view. Pardo is a lawyer, had been an SEC broker at one time, and had on at least one occasion solicited private money for a project. In more recent times, he had been an employee of the U.S. Department of Housing and Urban Development, where he was involved in policy development and research in the area of housing development. *See*, Transcript, at pp. 181, 200-03.

Matthew Forman first heard about Witness Tree from Jose Pardo in March 2001. Forman too had sophisticated experience in the business world, having been a CEO of Forman Distributing, a seller of beer and wine to restaurants, for twenty-five years.

Cirrito decided to invest in the LLC after a series of meetings with Caraluzzi. He recalls receiving from Caraluzzi copies of two documents, a business plan, also called an Offering Memorandum ("Memorandum"), and an Operating Agreement ("Agreement"); these are discussed in detail below. Atocha invested in April and May of 2001.

Pardo and Forman were officially recruited in a meeting at Pardo's house on March 15, 2001. Goodwin was present but left after one and one-half hours of the two hour meeting. Both Pardo and Forman recollect that Goodwin was

---

[2] All the investors, both Petitioners and Respondents, invested money beyond their original contemplated amounts when the restaurant was in trouble in the Spring of 2002.

a strong proponent of the venture and confirmed in some manner the fact that investors had made money through Caraluzzi's past ventures.

Forman recalls going through the Memorandum rather than the Agreement at the March 2001 meeting. *See,* Transcript, at p. 146. Pardo had reviewed both the Memorandum and the Agreement before the meeting. Pardo recalls Goodwin confirming that the original investors, called hereinafter Founders or Founding Members, owned forty-one units total in the LLC. *See,* Transcript, at p. 179.

Pardo committed to the project in June 2001 with $100,000. Forman committed $100,000 in December 2001, just prior to the restaurant opening, when it looked like it was going to happen. Both men also invested $24,000 apiece in March/April 2002.

Mesrobian, Song, and Tracey Caraluzzi had no connection whatsoever with recruiting the Petitioners. Goodwin did not speak to either Pardo or Forman after the March meeting and never spoke to Cirrito until after Atocha had invested.

Besides his way with words and ideas and his extensive "resume," Caraluzzi used a document to explain to potential investors what the LLC looked like. The Petitioners call this document an "Offering Memorandum"; the Respondents prefer "a business plan." The document calls itself a Memorandum, and that is the term I will use.

The Memorandum was drafted by Caraluzzi and went through several iterations. In fact, Caraluzzi and Rollinson were working on setting up the LLC before the doctors met Rollinson. *See,* Transcript, at p. 377. All the Founding Members reviewed the Memorandum and had an opportunity to comment upon it. *See,* Transcript, at pp. 820-21. One's impression is that preparation of the Memorandum was a somewhat haphazard, cut and paste operation. Song was the least involved in the preparation of the Memorandum, being the last one on board. He testified that the only contribution he made to the document was the addition of resume information.

Within the Memorandum, the original investors, Goodwin, Mesrobian, Song, Rollinson, and the Caraluzzis, are designated as "Founding Members." They are distinguished from simple investors. The Memorandum justifies the distinction by noting that: "To date, the company principals have spent hundreds of hours and funded all necessary expenses on the concept development including [various items]." *See,* p. 7 of the Memorandum, Pet. Ex. # 1.

The Petitioners claim that they were misled by assertions made in the Memorandum at pages 7 and 15. In particular, on page 7, the Memorandum states: "The Founding Members will contribute $360,000 of the necessary funds and own 41 investment units." Importantly, the Memorandum did not

state that these units were granted in return for the necessary funds; it simply noted the investment of those funds and the ownership of those units. On page 15, the Memorandum sets out a simple chart showing Founder Members owning forty-one percent of the LLC and Owner Members owning fifty-nine percent.

As a matter of fact, the Founders held units of the LLC both as Founding Members and as owner investors. They received units as Founding Members for their sweat equity, and they received additional units for the actual dollars they put into the project. *See*, Transcript, at p. 822. All of the Petitioners were uniform in their testimony that they understood the Memorandum to state that the Founding Members owned, in total, forty-one percent of the LLC, when in fact, by February 2001, the original investors owned over fifty percent. All of the Petitioners were also uniform in their testimony that they would not have bought into the venture had they known that the original investors owned shares both as Founding Members and owner members. *See*, Transcript, at pp. 63, 135-36, 180.

The Petitioners were also uniform in their assertion that the reason why the ownership percentages were so important was because they understood control of the LLC to rest on who owned what percentage; that is, they understood that the majority of "shareholders" could vote out a Board of Directors and control Witness Tree's operations.

This understanding is undermined, however, by the second document important to this case, the Operating Agreement. Unlike the Memorandum, which was drafted by Caraluzzi and changed shape over time, the Agreement was a legal document prepared by Rollinson, the venture's attorney. Caraluzzi seems to recall that the Founding Members did comment on this document, but directly to Rollinson, and that their comments were minimal. *See*, Transcript, at pp. 289-91.

Article Three of the Agreement states that the Founding Members hold forty-one units derived from their sweat equity. A separate paragraph of that Article sets out the price per unit for investors. In contrast to the fuzziness of the Memorandum, the Agreement is clear.

Article Seven of the Agreement describes control within the LLC. Mark Caraluzzi had absolute control "as to matters occurring in the ordinary course of business, management of the LLC." Further:

> As to matters not occurring in the ordinary course of business, including replacement of the Manager, management of the LLC shall be by the Founding Members, with Member Caraluzzi having two votes and the others voting per capita and not by ownership of Units.

Nothing could be farther from the Board of Directors/shareholders model described by the Petitioners.

The Agreement contained signature pages at the end of the document. At least one version of the Agreement has separate pages upon which "Investor Members" would sign and "Founding Members" would sign. *See*, M & G Ex. # 6. To set signatures off in this manner would be an additional alert to investors and would clearly identify the extent of each owner's interest. As with the other tasks of the enterprise, Caraluzzi was in charge of obtaining signatures and verifying the receipt of funds. *See*, Transcript, at p. 413.

Cirrito had no recollection of receiving a final copy of the Operating Agreement with all signatures appended. *See*, Transcript, at p. 93. The testimony of all the parties was very unclear as to whether anyone saw all the signatures attached to the Agreement. I have no evidence whatsoever of the Petitioners' signatures on the Agreement.

Petitioners' second allegation is that Respondents also misled them by not divulging Caraluzzi's prior bankruptcies, both professional and personal, and, furthermore, that Respondents knew that Caraluzzi had cheated his former restaurants. Unsuccessful expansion to a third location drove both Caraluzzi and Bistro Bistro's corporate owner into bankruptcy.

All the Respondents deny knowing anything at all about Caraluzzi's personal bankruptcy. And they deny knowing about Bistro Bistro's bankruptcy until the very last minute before Restaurant Seven opened in December 2001.

Caraluzzi's testimony on this point was not clear. He could not recall a specific occasion when he told Goodwin or Mesrobian about the Bistro Bistro bankruptcy.[3] He thought he told Song, but was no clearer on the circumstances of that alleged disclosure. There is no question that the Respondents discussed the failure of the Bistro Bistro in Ballston. What they did not discuss was the bankruptcy and the chain of events that forced Caraluzzi to sell the Bistros. The Founding Members did remember Caraluzzi's assertions that the Bistros had made money for investors, which was not a lie. Caraluzzi also testified that Rollinson told him that he had no obligation to tell investors about the Bistro bankruptcies. His reliance on Rollinson's advice belies his testimony that it was "possible but not probable" that he never told his fellow investors. *See*, Transcript, at p. 419.

Around the same time period that they learned of the bankruptcies, the Founding Members also became aware of rumors alleging that Caraluzzi had cheated Bistro Bistro by skimming money off the cash receipts to pay for personal expenses. *See*, Pet. Ex. ## 27 and 28. These allegations, which

---

[3] Mesrobian, a very credible witness, is quoted as saying, in December 2001, "What bankruptcy?" *See*, Transcript, at p. 819.

Caraluzzi denies, came very late in the game, December 2001. All of the Respondents deny knowing of the allegations before December.

In January 2002, the Founding Members discovered that the restaurant was in serious financial trouble. They fired Caraluzzi in February. *See*, M & G Ex. # 28. Suffice it to say that, during the Spring and Summer, the Founders and investors struggled to reconstitute the operation. The Petitioners were unable to agree with the Founding Members and other investors and their disagreement eventually resulted in this lawsuit. The attempts of another investor, Michael E. Young, to buy Petitioners out were not successful.[4] The restaurant eventually failed.

## Legal Analysis

Petitioners' first claim arises under the Virginia Securities Act (VSA). Section 13.1-522(A) of that act imposes liability on any person who knowingly sells a security by means of an untrue statement of material fact.[5] Subsection (C) of § 13.1-522, imposes similar liability on any person who controls a person liable under subsection (A).[6] Therefore, the threshold issue in Petitioners' VSA claim is whether the various Respondents were sellers of securities, or, alternatively, controlled a seller of securities. If they were not and did not, they would lie outside the scope of Va. Code § 13.1-522 (A) and (C). The parties are agreed that, given the scarcity of Virginia case law interpreting the VSA, the Court may consider cases interpreting the federal Securities Act of 1933 for guidance. *Accord, Shavin v Commonwealth*, 17 Va. App. 256, 437 S.E.2d 411 (1993).

In defining the term "seller," the parties have looked to *Pinter v. Dahl*, 486 U.S. 622, 100 L. Ed. 2d 658, 108 S. Ct. 2063 (1988). The litigation in Pinter concerned § 12(1) of the federal Securities Act, which imposes liability

---

[4] Young's efforts were the subject of Respondents' Plea in Bar, which the Court denied. *See*, M & G Ex. ## 55-66.

[5] "Any person who . . . sells a security by means of an untrue statement of a material fact or any omission to state a material fact necessary in order to make the statement made, in the light of the circumstances under which they were made, not misleading . . . and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable to the person purchasing such security from him. . . ." Va. Code § 13.1-522(A).

[6] "Every person who directly or indirectly controls a person liable under subsection A . . . of this section, including every partner, officer, or director of such a person, every person occupying a similar status or performing similar functions . . . shall be liable jointly and severally with and to the same extent as such person, unless able to sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist."

on "any person who ... *offers or sells* a security [improperly]." 15 U.S.C. 77l(a)(1) (emphasis added). The Court considered the Act's definitions of "offer" and "sale," and determined that one who solicits a sale of securities may be liable under § 12(1).

There is, however, a crucial difference between the relevant sections of the federal Securities Act and the VSA. Like the federal act, the VSA specifically defines the terms "sale" and "offer." Solicitation and similar activities are covered by the term "offer," whereas "sale" is restricted to contracts for the sale or disposition of securities. Va. Code § 13.1-501. Turning to § 13.1-522(A), it imposes liability on sellers of securities; unlike § 12(1) of the Securities Act, it makes no mention of offerors. It is apparent, therefore, that the Virginia legislature, having distinguished between sales and offers, chose to impose § 13.1-522 liability on sellers alone.[7] Therefore, *Pinter* must be distinguished, as the statute there at issue specifically imposed liability on both sellers and offerors.

The parties have cited two cases to support the proposition that "seller" is used identically under the VSA and the federal act. *Shavin v. Commonwealth* concerned § 13.1-507 of the VSA, which, like § 12(1) of the federal act, does apply to sales and offers. 17 Va. App. 256, 260-61, 437 S.E.2d 411 (1993). In *Waterside Capital v. National Assisted Living*, the Court simply accepted the parties' agreement that "seller" meant the same thing under both acts. 59 Va. Cir. 466 (2002).

As § 13.1-501 of the VSA excludes solicitation from the scope of "sale" and "sell," a mere solicitor cannot be held liable under § 13.1-522, which applies only to sales. Therefore, the only seller in this case was Witness Tree, which contracted with Petitioners for the sale of an interest in the LLC and Restaurant Seven.

However, assuming, *arguendo,* that liability under § 13.1-522(A) is co-extensive with liability under § 12(1) of the federal act, I will consider Petitioners' claims against each Defendant in turn. Under *Pinter*, § 12(1) liability attaches to one who "successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Pinter* at 647. Such successful solicitation must involve more than mere participation in a sale. *Id.* at 650. Indeed, "some sort of active participation in the solicitation is required; collateral participants are not liable as statutory sellers." *Fransen v. Terps, L.L.C.,* 153 F.R.D. 655, 658 (D. Colo. 1994).

First, as to Defendant Tracey Caraluzzi, no evidence was introduced that she solicited anyone, Petitioners or otherwise, to invest in Witness Tree.

---

[7] Other sections of the VSA do impose liability on offerors, for example § 13.1-507.

Accordingly, she cannot be liable as a seller of securities. As to Defendant Mesrobian, the facts are similar. Petitioners uniformly testified that he was not involved in soliciting their investment. Although he was a Founding Member, the evidence did not show that he actively participated in preparing the documents relied upon by Petitioners or that he solicited their investment.

As to Defendant Song, Petitioners allege that he provided information to be included in the Memorandum knowing that that document would be used to solicit investment, that he identified potential investors, and that he himself solicited other investors. The latter two allegations are beside the point, as they do not indicate that Song solicited the petitioning investors. Even if it had been proven that Song solicited investment from third parties, this would not have made him liable to Petitioners.[8] Furthermore, Song testified that he never did solicit investors for the restaurant.

Caraluzzi seemed to remember that Song had recruited Mike Beall; however, his testimony on this point was vague and uncertain. *Compare*, Transcript, at p. 268 *with* 439-41. Dr. Song hotly disputed that he recruited Beall; his side of the story is credible. *See*, Pet. Ex. # 23, where Beall's name appears under "Bob." Song's testimony was clear and forceful.

As for the remaining allegation, that Song knowingly provided personal information to be used in the Memorandum, this is undoubtedly true. It is not, however, sufficient to establish that he was a solicitor of investment.[9] Petitioners have cited *Capri v. Murphy* for the holding that one can be a seller without having direct contact with the buyer. 856 F.2d 474, 478 (2d Cir. 1988). In *Capri*, one non-party to the litigation had been the point-person for the sale and was the only person who ever directly contacted the buyers. The defendants, on the other hand, never met the buyers, but did prepare and circulate the prospectus on which the buyers relied. The Court found that this activity was sufficient to make the defendants sellers under the federal Securities Act. The testimony in this case, however, indicates that Song was only marginally involved in preparing the Memorandum. Caraluzzi testified that Song was the last Founding Member to receive and review the

---

[8] Under § 13.1-522, a seller is only liable "to the person purchasing such security from him." Therefore, even if Song were a seller vis-a-vis some third party, he would not be liable to Petitioners.

[9] Song cites *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531 (1989), for the proposition that simple provision of personal information to be used in offering documents cannot lead to liability. However, such a reading rather expands the holding of *Moore*, which did not rule out liability for such activity in all situations, but only as to attorneys who had provided professional services in structuring the transaction at issue. The decision drew on specific language in *Pinter*, excluding from liability professionals who do not actively pursue sales, but simply provide services relating to the sale.

Memorandum and that it was "in a much more completed state when [Song] became involved." *See,* Transcript, at pp. 277-78. Song's only concrete contribution, according to Caraluzzi, was provision of a resume. This is collateral participation in the sale and cannot be viewed as active or direct solicitation.

Defendant Goodwin, it is agreed, appeared at the March 2001 sales pitch to Petitioners Forman and Pardo; he introduced Caraluzzi at that meeting and participated in the discussions. Goodwin argues that this does not suffice to make him a seller because he did not successfully solicit the purchase. This is apparently based on the fact that Pardo did not invest until approximately two and a half months later, while Forman waited more than nine months. Furthermore, before they invested, Pardo had additional discussions with Caraluzzi, and Forman discussed the investment extensively with Pardo. Neither appears to have discussed the matter further with Goodwin. As a general matter, it is not clear that passage of time alone should suffice to erase a party's status as a seller. However, in this case, Goodwin's involvement was so minimal that I cannot find that he was a successful solicitor of purchases by Forman and Pardo.

Finally, as to Defendant Mark Caraluzzi, it is apparent that he was the point-man on this sale. It is undisputed that he discussed the investment extensively with each Petitioner: answering questions, preparing with Rollinson the offering documents, and managing the restaurant's operations. Caraluzzi did solicit investment from each Petitioner and could be liable under § 13.1-522(A) if it were co-extensive with § 12(1) of the federal Securities Act. However, as determined above, the only seller in this case was the LLC.

Of course, § 13.1-522(C) imposes liability on those able to control a seller who has run afoul of § 13.1-522(A). Therefore, it must next be determined whether the sale was made by means of a misrepresentation or omission of a material fact. If it was, the Defendants' status as control persons will require investigation.

A fact is deemed material when "it influences a person to enter into a contract, when it deceives him and induces him to act, or when without it the transaction would not have occurred." *Packard Norfolk v. Miller,* 198 Va. 557, 563, 95 S.E.2d 207 (1956). In the context of the federal Securities Act, facts are material if "there is a substantial likelihood that a reasonable purchaser or seller of a security (1) would consider the fact important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by disclosure of the fact." *Longman v. Food Lion, Inc.,* 197 F.3d 675, 683 (4th Cir. 1999).

In this case, Petitioners' VSA claim is based on three statements: representations in the Memorandum and Agreement as to the Founding

Members' share of ownership, the failure to disclose Caraluzzi's personal bankruptcy and that of his previous venture, and Song's failure to disclose that he thought Caraluzzi would steal. Petitioners claim that the first representation was material because it led them to believe control of Witness Tree would reside with the Investors rather than the Founders. They contend that the latter omissions were material because they belied the assertion that Caraluzzi was a successful veteran restauranteur.

As noted above, the Memorandum contained an "Executive Summary," at page 7, which explained Witness Tree's ownership structure. Ownership was divided into one hundred investment units. The Founding Members were to contribute $360,000 in necessary funds and own forty-one investment units. The other fifty-nine units were dubbed "Investor units" and would be offered to investors in an effort to raise an additional $1,140,000. Investors were to be enticed by an offer of preferential treatment in the payment of distributions; they would receive eighty percent of profits, to the Founders' twenty, until their initial investment had been recouped.

The Agreement contained a more comprehensive explanation of the venture's ownership and control. On page 1, it provided that the Founders held forty-one Founder Units, which had been issued in return for "services, plans, intellectual property, and other assets." The Agreement made no mention of the $360,000 in necessary funds noted in the Memorandum. The Agreement also provided for fifty-nine Investor Units and described certain discounts in return for large investments. The Agreement did not preclude Founding Members from increasing their stake by purchasing additional units.

Corporate control was dealt with in various provisions of the Agreement, most importantly Article Seven, "Management." This provided that events in the ordinary course of business were to be handled by the Manager, Caraluzzi. Matters outside the ordinary course of business were to be decided by the Founding Members, with Caraluzzi having two votes and every other Founder having one. Article Seven did not provide for any participation by Investor Members. However, Articles One and Eleven did provide for all members to vote on two issues: termination of the LLC and amendment of the Agreement. A majority in interest could decide the LLC's term. The Agreement could be amended only with the support of a majority in interest that included a majority of each ownership class.

Materiality must be decided in the context of "the total mix of information" made available to an investor. In light of the explanations provided in the Memorandum and Agreement, I cannot find that any material misrepresentation was made as to ownership and control of the LLC. Petitioners rely solely on those documents; no other source of misrepresentation is alleged. However, the documents provided no indication

that Defendants would have been able to obtain control of the LLC. In fact, they demonstrated precisely the opposite. The Memorandum states that Founding Members would hold forty-one units, with an additional fifty-nine being offered to investors. Nothing in the Memorandum indicates that Founders were barred from investing additional funds in return for additional, investment units. Thus, any notion that control had been reserved for investors was merely an inference drawn by Petitioners.

Furthermore, any such notion would have been dispelled by reading the Agreement. This document briefly summarized the LLC's entire control structure, leaving only one issue, Witness Tree's termination, to be decided purely by a majority of shareholders. Holders of investment units were excluded from all other management decisions bar amendment of the Agreement, and even here a majority of investors could never have gained control unless supported by a majority of the Founders. Holders of investment units were completely denied control of the LLC. They agreed to this arrangement, presumably, because they were given preferential treatment in profit distribution. Therefore, viewed in the context of all the information provided to Petitioners, any inference that they could or would obtain a controlling interest in the LLC is outweighed by the clear allocation of control to the Founding Members. No material misrepresentation was made, therefore, as to the LLC's ownership and control.

Petitioners next turn to Defendants' failure to reveal Caraluzzi's and Bistro Bistro's bankruptcies. Defendants assert that the bankruptcies belied the representations that Caraluzzi's prior ventures had been successful. In response, Caraluzzi asserts that Petitioners did not investigate these issues, being primarily concerned with Restaurant Seven's concept and the returns generated for investors in his prior ventures. He also explains the bankruptcies at length, indicating that they were caused by circumstances beyond his control, rather than by his failures in restaurant management. Therefore, he submits, the representation that he was a successful restauranteur was not false.

However, the crucial issue here is not whether the seller could have satisfactorily explained the omitted facts. Instead, the Court's inquiry is simply whether a material fact was omitted, leading to a sale. In this case, there is a substantial likelihood that a reasonable investor would have considered the bankruptcies important in deciding whether to invest in the LLC. Although Petitioners might still have invested, it cannot be doubted that the bankruptcies would have shed a different light on any statements made concerning Caraluzzi's experience. Given the importance placed on that experience, by Founding and Investing Members alike, the disclosure would certainly have

influenced the deal. Therefore, I find that a material omission was made when Petitioners were not told of the bankruptcies.

To summarize, I have found that Witness Tree was a statutory seller. It was liable under the VSA for selling a security by means of an omission to state a material fact necessary to prevent those statements that were made from being misleading. Of course, all claims against the LLC have been stayed due to bankruptcy. However, any Defendant who controlled the LLC faces liability under § 13.1-522(C).

Under § 13.1-501 of the VSA, control is defined as "the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." Whether a party is a controlling person is "an intensely factual question. ... [For example, a] director is not automatically liable as a controlling person." *Arthur Children's Trust v. Keim,* 994 F.2d 1390, 1396 (9th Cir. 1993). Once again, the VSA section at issue closely tracks a provision in the federal Securities Act, in this case § 20(a). 15 U.S.C. 78t(a). Given the close similarity between the statutes, federal cases concerning control are informative.

In arguing that they lacked control, Caraluzzi's co-Defendants point to the Agreement, which delegated matters in the ordinary course of business to Caraluzzi. Furthermore, where matters were to be decided by a vote of the Founding Members, Caraluzzi was granted two votes and the others only one. Because Caraluzzi had twice the votes of the other founders, each argues that Caraluzzi was beyond their control.

The VSA, however, is not couched in terms of control over day-to-day operations or voting weights. Instead, if a party possesses, even indirectly, the power to direct policies and management, that party is a control person. Although daily operations were in Caraluzzi's control, Caraluzzi and the LLC were, ultimately, controlled by the other Founding Members. Although each Founder, individually, could not outvote Caraluzzi, they could, as a group, outvote him; in fact, they did ultimately remove him from his position. The argument that one lacks control because one cannot individually control corporate policy cannot be countenanced; to do so would generally absolve officers and directors from control liability.[10] Therefore, because the Respondents, as Founding Members, had the ability "indirectly ... to direct or cause the direction of [the LLC's] management and policies," they controlled the LLC, and are potentially liable for any misstatements or omissions for which it is liable under § 13.1-522(A).[11] To escape

---

[10] Further, this result would not be in keeping with the statute, which specifically names partners, officers, and directors as control persons, whether they are directly in control or not. Va. Code § 13.1-522(C).

[11] In addition, if Caraluzzi were deemed a seller under § 13.1-522(A), this analysis would make the other Founding Members potentially liable as control persons for any actions taken by him.

liability, they must show that they did not know and could not reasonably have known of the misrepresentation. Va. Code § 13.1-522(C).

Apart from Caraluzzi, Respondents uniformly testified that they did not know of the bankruptcies until after Petitioners had invested. Similarly, Song's statement that he knew Caraluzzi would steal arose from information obtained after Petitioners had invested. Therefore, at the time of sale, Defendants did not know of the bankruptcies.[12] However, Petitioners argue that they reasonably could have known and, thus, are ineligible for § 13.1-522(C)'s good faith defense.

The evidence in this case showed that the wooing of investors, including production of the offering documents, was delegated to Caraluzzi, the only Founder with extensive restaurant experience. Furthermore, the documents were reviewed by Rollinson, the LLC's counsel. There is no indication that this system was unreasonable or inadequate for the purposes of vetting presentations to investors or that the other Founding Members should have been more closely involved. Petitioners unflatteringly compare the system to that in *Dellastatious*, which was deemed a proper review system by the Fourth Circuit. *Dellastatious v. Williams*, 242 F.3d 191 (4th Cir. 2001) (finding that corporate directors acted reasonably in relying on corporate decision-making structure to monitor information provided to investors). However, any differences are attributable to the relative size and scope of the enterprises at issue. The *Dellastatious* corporation was a substantial venture with subsidiaries, a CEO, a CFO, and a board of directors. In contrast, Witness Tree was a small LLC established to own and run a local restaurant. Day-to-day management, including fund-raising, was delegated to the member with the most experience in the restaurant business. Furthermore, all documents were submitted to the corporation's counsel for review. I decline to hold that this delegation was unreasonable or that the other Founders should have exercised additional care to prevent misrepresentations.

Of course, the good faith defense is not available to Caraluzzi, who undeniably knew of the relevant bankruptcies. In his defense, Caraluzzi argues that he was advised by counsel that he need not reveal that information to investors. This, however, is not a defense to a § 13.1-522(C) claim. The statute imposes liability on all control persons "unless able to sustain the burden of proof that [they] did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist." Caraluzzi, like all the Founders, was a control person at Witness Tree; he has not sustained and cannot sustain the burden of

---

[12] Although it could be assumed that Defendant Tracey Caraluzzi knew of the bankruptcies, no evidence that she did know was proffered to the Court.

proof that he did not know of the bankruptcies. Because omission of these facts from the information provided to Petitioners was material, the LLC is liable as a seller. By extension, Caraluzzi is liable as a control person.

Petitioners have also brought common law fraud claims, alleging both actual and constructive fraud. A successful claim for actual fraud requires clear and convincing proof of "(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled." *Prospect Devel. Co. v. Bershader*, 258 Va. 75, 85, 515 S.E.2d 291, (1999). As against all Defendants but Mark Caraluzzi, Petitioners' claim fails at the first step. No evidence was presented that Tracey Caraluzzi, Mesrobian, or Song made any representations whatsoever. As to Goodwin, he addressed Pardo and Forman at one meeting. However, the evidence demonstrates that he did not know of the bankruptcies at the time of that meeting. Therefore, he could not have knowingly made any false representations at that time. In the absence of a knowingly false representation, Petitioners have failed to prove a case for actual or constructive fraud against these Defendants.

As for Mark Caraluzzi, Petitioners have not shown that his silence concerning the bankruptcies was born of an intent to mislead. In the absence of intent, the case for actual fraud must fail.

In the alternative, Petitioners have pleaded constructive fraud, which requires a "showing by clear and convincing evidence that a false representation of a material fact was made innocently or negligently, and the injured party was damaged as a result of his reliance upon the misrepresentation." *Id.* at 86. In addition, "concealment can give rise to constructive fraud only in cases where there is a duty to disclose the concealed fact." *Cohn v. Knowledge Connections, Inc.*, 266 Va. 362, 367, 585 S.E.2d 578 (2003). As discussed above, Caraluzzi's failure to reveal the bankruptcies was an omission of material fact. Testimony indicated that the omission was innocently made, on the advice of counsel. A duty to reveal the omitted facts was imposed by provisions of the VSA. However, the question remains as to whether Petitioners relied on the omission and were damaged as a result. In considering reliance, the question is not whether Petitioners might have acted otherwise had they known the truth but, rather, whether they did, in fact, rely on the misrepresentation. *Nationwide Ins. Co. v. Patterson*, 229 Va. 627, 630, 331 S.E.2d 490 (1985).

Here, the Court recalls no clear evidence that Petitioners detrimentally relied on statements concerning Caraluzzi's experience. Furthermore, Petitioners give the issue short shrift in their pleadings, concerning themselves more with the issues of control and ownership. However, even if the Court were to assume reliance, there is an absence of clear and convincing evidence

of damages resulting from that reliance. Therefore, Petitioners' constructive fraud claim against Caraluzzi must fail.

The Court finds, therefore, that Petitioners have succeeded in their claim against Mark Caraluzzi under Virginia Code § 13.1-522(C). Pursuant to that Code Section, damages are "the consideration paid for such security, together with interest thereon at the annual rate of six percent, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of such security, or for the substantial equivalent in damages if he no longer owns the security." Va. Code § 13.1-522(A) and (C). Here, each Petitioner should receive the full value of his initial investment in Witness Tree, together with six percent annual interest, costs, and attorneys' fees. The Court did not receive evidence that Petitioners received any income from Witness Tree, and, therefore, no deductions from the initial investment amount are made. Petitioners' additional investments, of Spring 2002, were separate transactions; they were made with full knowledge of the bankruptcies and not improperly obtained. Petitioners cannot recover for those investments. All other claims against Mr. Caraluzzi are dismissed, as are all claims against the other Respondents.