Present:  All the Justices

TIMOTHY R. RASH, ET AL.

OPINION BY JUSTICE LEROY R. HASSELL, SR.

v.   Record No. 950896          March 1, 1996

HILB, ROGAL & HAMILTON
COMPANY OF RICHMOND

FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Randall G. Johnson, Judge

I.

In this appeal, we consider issues that arose during the trial of a suit in equity for a breach of contract, tortious interference with contractual relations, and common law conspiracy.

II.

Hilb, Rogal & Hamilton Company of Richmond (HRH) filed its amended bill of complaint against Susan M. Rash, Timothy R. Rash, and Rash & Associates, Inc., a Virginia corporation.  HRH alleged that Mr. Rash breached his employment agreement, which included a covenant not to compete.  HRH further alleged that Mrs. Rash tortiously interfered with its contractual relations and that Mr. and Mrs. Rash had engaged in a common law conspiracy.  HRH sought damages, injunctive relief, costs, and attorney's fees.

At the conclusion of an ore tenus hearing, the chancellor held that these allegations had been proven.  The chancellor assessed damages against the Rashes and Rash & Associates and awarded costs, attorney's fees, and certain injunctive relief. The chancellor held that the Rashes and Rash & Associates are jointly and severally liable to HRH in the amount of $111,891, which was stipulated by the litigants to be 75% of all commissions that Mrs. Rash or Rash & Associates received from

certain accounts that were formerly serviced by HRH.  The chancellor's decree established a constructive trust requiring that Mrs. Rash and Rash & Associates, as constructive trustees, pay to HRH 75% of all commissions earned from certain accounts that were formerly serviced by HRH.  The Rashes and Rash & Associates appeal.

III.

When a chancellor hears evidence ore tenus, his decree is entitled to the same weight as a jury verdict, and we are bound by the chancellor's findings of fact unless they are plainly wrong or without evidence to support them.  Morris v. Mosby, 227 Va. 517, 522, 317 S.E.2d 493, 497 (1984).  Additionally, we will review the evidence and all reasonable inferences fairly deduced therefrom in the light most favorable to HRH, the prevailing party below.  Id.

HRH is an insurance sales firm which sells various types of insurance, including insurance benefits products.  In September 1990, HRH purchased certain tangible and intangible assets of The James River Financial Group, Inc., including its division that sold insurance benefits products.

As employees of the James River Financial Group, the Rashes were involved in the marketing of benefits insurance products. Mr. Rash was part owner of the James River Financial Group, and he received a portion of the purchase price when HRH acquired the James River Financial Group's assets.

After HRH acquired the James River Financial Group's assets, Mr. Rash became a senior vice president of HRH.  In this capacity, he was in charge of HRH's group benefits division.  Mr.

Rash's employment agreement with HRH, which he signed after consultation with legal counsel, contains a covenant that prohibits him from competing directly or indirectly against HRH upon termination of his employment.

Mrs. Rash also became an employee of HRH. She worked as a benefits consultant for HRH and, in that capacity, she had complete access to HRH's confidential customer and business information. She also worked closely with Mr. Rash, and she accompanied him when he tried to solicit new business accounts for HRH. Mrs. Rash was not required to sign a covenant not to compete.

In November 1992, Mr. Rash initiated negotiations with HRH to purchase its group benefits business. According to Mr. Rash, Mrs. Rash was working "behind the scenes" during the negotiations to purchase the business from HRH. During these negotiations, the Rashes decided that if they were unable to acquire HRH's group benefits division, Mrs. Rash would form her own competitive insurance company and solicit HRH's accounts. Mr. Rash forwarded a letter to his attorney stating, "I definitely believe that either Susan or I would be successful in acquiring several of the accounts which they don't want to sell. We could possibly keep them all!"

Mr. Rash was unsuccessful in his attempt to purchase HRH's group benefits division. Subsequently, the Rashes resigned from their employment with HRH effective March 31, 1994. Later that day, the Rashes went to a store where Mrs. Rash used Mr. Rash's credit card to purchase a facsimile machine. Mr. Rash knew that Mrs. Rash was purchasing this facsimile machine for use in her

new business, Rash & Associates.  On another occasion, Mrs. Rash used her husband's credit card to purchase office equipment and a printer for Rash & Associates.  Ultimately, Rash & Associates reimbursed Mr. Rash for these expenses.

During its first month of operation, Rash & Associates, which competed for HRH's insurance benefits accounts, conducted business in the Rashes' jointly-owned residence.  Mrs. Rash used her husband's leased automobile to conduct business on behalf of Rash & Associates.

Mrs. Rash encountered problems when she tried to acquire operating capital for her new corporation.  The initial business purchases and operating expenses for her company were provided by Mr. Rash.  Mr. Rash deposited a check payable to him in the amount of $8,000 in a joint checking account that he owned with Mrs. Rash.  Mr. Rash knew that Mrs. Rash intended to use some of these funds to pay for Rash & Associates' operating expenses.

Mrs. Rash informed Mr. Rash that she was trying to borrow money for Rash & Associates and that she had become frustrated with the process of borrowing money.  The Rashes discussed with their attorney the possibility of encumbering their jointly-owned home as security to obtain financing for Rash & Associates.  Mrs. Rash asked her husband if he would be willing to join in such a transaction.  Mr. Rash refused to do so.

During a conversation with their attorney, the Rashes discussed the use of their jointly-owned mutual funds as collateral to obtain the necessary financing for Rash & Associates.  Subsequently, Mr. Rash assigned his interest in the mutual funds to his wife, who used them as collateral to obtain a

loan for Rash & Associates.  Mr. Rash testified that he made the assignment because he did not want his name to appear on any documents relating to Rash & Associates.

Rash & Associates eventually acquired many group benefits insurance accounts that had been serviced by HRH.  Mrs. Rash testified that in 1994, Rash & Associates received $136,011 in commissions, and $135,000 of those commissions were from former HRH accounts.

IV.

Mr. Rash asserts that the chancellor erred in holding that he violated his covenant not to compete and that he engaged in a competing business by allowing his wife to use jointly-held marital assets to fund Rash & Associates.  Additionally, Mr. Rash asserts that he did not "engage" in his wife's business.  HRH argues, and we agree, that there is substantial evidence to support the chancellor's finding that Mr. Rash breached his employment agreement.

> The covenant not to compete states in relevant part: [After termination, Mr. Rash] shall not directly or indirectly as an owner, stockholder, director, employee, partner, agent, broker, consultant or other participant, for a period of three (3) years from the date of such termination:
>
> . . . .
>
> (e) engage in any manner in any business competing directly or indirectly with [HRH].

(Emphasis added).

As we have often stated, "[t]he parties' contract becomes the law of the case unless it is repugnant to some rule of law or public policy."  Winn v. Aleda Const. Co., 227 Va. 304, 307, 315, 315 S.E.2d 193, 194 (1984).  Accord D.C. McClain, Inc. v.

<u>Arlington County</u>, 249 Va. 131, 135, 452 S.E.2d 659, 662 (1995). Additionally, we "must give effect to the intention of the parties as expressed in the language of their contract, and the rights of the parties must be determined accordingly." <u>Foti</u> v. <u>Cook</u>, 220 Va. 800, 805, 263 S.E.2d 430, 433 (1980).

The record is replete with evidence that Mr. Rash acted as a participant who, at the very least, indirectly engaged in a business that competed against HRH. For example, as we mentioned above, Mr. Rash relinquished his interest in a jointly-owned mutual fund account so that Mrs. Rash could use those funds as collateral to secure a loan that was used for operating capital for Rash & Associates. And, as the chancellor found, Rash and Associates would not have been able to conduct business without this loan.

V.

The Rashes challenge that portion of the chancellor's decree awarding damages against them. Mrs. Rash asserts that she did not tortiously interfere with Mr. Rash's contract with HRH or with HRH's business expectancies. Further, she contends that the chancellor erred by awarding contract damages on the tortious interference claim and that the damages were punitive and without relationship to the actual harm suffered by HRH. Mr. Rash argues that the chancellor erred in imposing liquidated damages against him because his contract of employment purportedly does not provide for such damages. He also claims that the liquidated damage provision in his contract is unenforceable because it bears no relationship to the actual losses sustained by HRH.

As HRH observes, we cannot consider these arguments advanced

by the Rashes because there is an independent basis to support the chancellor's ruling on these issues and that basis has not been challenged on appeal. In his final decree, the chancellor found that the Rashes had engaged in a common law conspiracy against HRH. The chancellor made a unitary award of damages, and an unspecified portion of those damages are compensation for the Rashes' common law conspiracy against HRH. The Rashes do not assign error to the chancellor's finding that they had engaged in a common law conspiracy; nor do they assign error to that portion of the chancellor's decree which awards damages to HRH because of the Rashes' common law conspiracy.

Therefore, those portions of the chancellor's decree holding that the Rashes had engaged in a common law conspiracy and that HRH is entitled to recover damages resulting from that conspiracy have become final and are not before this Court on appeal. Rule 5:17(c); see United Leasing Corp. v. Thrift Ins. Corp., 247 Va. 299, 308, 440 S.E.2d 902, 907 (1994); Crist v. Metropolitan Mortgage Fund, 231 Va. 190, 193, 343 S.E.2d 308, 310 (1986); Stamie E. Lyttle Co. v. County of Hanover, 231 Va. 21, 27, 341 S.E.2d 174, 178 (1986); Haynes v. Bekins Van & Storage Co., 211 Va. 231, 233, 176 S.E.2d 342, 344 (1970).

## VI.

The Rashes assert that the trial court erred by imposing a constructive trust in favor of HRH. We disagree.

In Leonard v. Counts, 221 Va. 582, 588-89, 272 S.E.2d 190, 195 (1980), we stated:

> Constructive trusts are those which the law creates, independently of the intention of the parties, to prevent fraud or injustice. Porter v. Shaffer, 147 Va. 921, 928, 133 S.E. 614, 616 (1926). While there is a distinction between resulting and constructive

trusts, albeit often difficult to determine, the same remedial principles apply to both.  Id. at 928-29, 133 S.E. at 616.  Constructive trusts have also been defined more comprehensively as follows:

> "Constructive trusts arise, _independently of the intention_ of the parties, _by construction of law_; being _fastened upon the conscience_ of him who has the legal estate, in order to prevent what otherwise _would be a fraud_. They occur not only where property has been acquired by fraud or improper means, but also where it has been fairly and properly acquired, but it is contrary to the principles of equity that it should be retained, at least for the acquirer's own benefit."

1 Minor on Real Property § 462 at 616 (2d ed. Ribble 1928).

Accord Overby v. White, 245 Va. 446, 449-50, 429 S.E.2d 17, 19 (1993); Greenspan v. Osheroff, 232 Va. 388, 400, 351 S.E.2d 28, 36-37 (1986).

Here, the chancellor found that the Rashes engaged in a common law conspiracy by diverting HRH's contracts to Mrs. Rash's corporation.  Certainly, such conduct constitutes an improper means which, under the facts and circumstances of this case, justifies the imposition of the constructive trust.

## VII.

Because we find no error in the decree appealed from, it will be affirmed.

Affirmed.