**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

————————

**No. 06-2028**

————————

WESTERN INSULATION, LP,

Plaintiff - Appellee,

versus

HAL MOORE; MELANIE MOORE,

Defendants - Appellants.

————————

**No. 06-2075**

————————

WESTERN INSULATION, LP,

Plaintiff - Appellant,

versus

HAL MOORE; MELANIE MOORE,

Defendants - Appellees.

————————

Appeals from the United States District Court for the Eastern
District of Virginia, at Richmond.  James R. Spencer, Chief
District Judge.  (3:05-cv-00602-JRS)

————————

Argued:  May 24, 2007                    Decided:  July 25, 2007

————————

Before MICHAEL, Circuit Judge, WILKINS, Senior Circuit Judge, and David C. NORTON, United States District Judge for the District of South Carolina, sitting by designation.

---

Affirmed in part, reversed in part, vacated in part, and remanded by unpublished per curiam opinion.

---

**ARGUED:** John B. Simpson, MARTIN & RAYNOR, P.C., Charlottesville, Virginia, for Appellants/Cross-Appellees. Stephen C. Tedesco, LITTLER MENDELSON, P.C., San Francisco, California, for Appellee/Cross-Appellant. **ON BRIEF:** Ronald S. Sofen, GIBBS, GIDEN, LOCHER & TURNER, L.L.P., Los Angeles, California, for Appellants/Cross-Appellees. Paul J. Kennedy, LITTLER MENDELSON, P.C., Washington, D.C.; Mendy L. Mattingly, LITTLER MENDELSON, P.C., San Diego, California, for Appellee/Cross-Appellant.

---

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Hal and Melanie Moore appeal a judgment against them in an action brought by Western Insulation, LP ("Western"), for the Moores' alleged breaches of certain non-compete agreements. Western cross-appeals the decision of the district court to deny its request for injunctive relief. We affirm in part, reverse in part, vacate in part, and remand for further proceedings.

## I.

In March 2001, Hal, as sole shareholder of the San Diego insulation company Western Insulation, Inc. ("Western, Inc."), entered into an agreement whereby Western, Inc. sold most of its assets to Western, a wholly owned subsidiary of Service Partners, LLC, for $41,990,000.00 ("the Sale Agreement"). At the time of the Sale Agreement, Hal's wife Melanie was an employee and the CFO of Western, Inc. Pursuant to the Sale Agreement, both Moores entered into identically worded Confidentiality, Non-Competition, and Non-Solicitation Agreements ("the Non-Competes"), which, as is relevant here, provided:

> As consideration for and to induce the Partnership to pay the consideration set forth in the Contribution and Sale Agreement, Moore hereby covenants and agrees that, except as the Partnership may expressly authorize or direct in writing, he [/she] shall not, for a period of seven (7) years from the date hereof (the "Non-Compete Period"), directly or indirectly (a) own, manage, operate, join, or control (or participate in the ownership, management, operation or control of), any ... business entity that, within the restricted territories identified ..., which are the territories in which

3

[Western, Inc.] conducted business immediately prior to the transactions set forth in the Contribution and Sale Agreement, engages in the business of selling, distributing or installing Restricted Products ... or (b) serve as an employee, agent, consultant, officer, director or representative of any such business entity ....

....

During the Non-Compete Period, Moore shall not directly or indirectly:

A. employ or retain any individual who is or was an employee or officer of [Western, Inc.] during the twelve (12) month period immediately preceding the date hereof ... [or]

B. contact, solicit or assist in the solicitation of any [such] individual ....

J.A. 943-44, 951-52. The geographic scope of the ban was the state of California and the area within a 125-mile radius of Phoenix, Arizona. The agreement provided that it would be interpreted and enforced in accordance with Virginia law.

Over more than 20 years, Hal had developed a close and longstanding relationship with City National Bank. Melanie used this relationship to help obtain financing for two insulation companies that would compete with Western. In March 2005, she signed a secondary personal guaranty for a $1.41 million line of credit to assist Stephanie Schulkamp in forming one of those companies, American Insulation, Inc. Schulkamp was a friend of Melanie's and had served for several years as a high-level employee of Hal's businesses, including Western, Inc. By virtue of Hal's ties to the bank, Melanie was able to obtain preferential treatment

4

for Schulkamp, who would not have been able to obtain the financing without Melanie's assistance. According to the loan guarantee agreement, Schulkamp may earn only $90,000 per year and must obtain Melanie's consent to make any purchase for the company in an amount exceeding $25,000. The agreement also entitles Melanie to certain financial information regarding American.

In return for the guaranty, Schulkamp granted Melanie a security interest in American's assets and secured the guaranty with her home and her shares in American. The parties' agreements prohibit Schulkamp from transferring any of this collateral without Melanie's consent. They further grant Melanie an option to purchase 90 percent of the company for $9,000. The option may be exercised between March 13, 2008 (the expiration date for her Non-Compete) and March 5, 2010, or immediately if Melanie's Non-Compete is held to be unenforceable by a court of competent jurisdiction.

Melanie also signed a secondary personal guaranty for a $1.015 million commercial line of credit to help another former longtime Western, Inc. employee, Dave Barnes, obtain financing to start his own insulation business to compete with Western, Empire Insulation. Melanie also advised Barnes concerning the loan amount he should seek. As she did with Schulkamp, Melanie used the relationship Hal had developed with City National Bank to obtain this financing for Barnes, which he would not have received without her assistance.

Hal also had dealings with American and Empire after signing his Non-Compete. Since 1984, Hal has owned a building in San Diego that he used for many years as the headquarters for Western, Inc. and several of his other businesses. Western was also headquartered there for approximately three years, ending March 1, 2004. Following Western's departure, much of the space in the building remained vacant until Hal leased it to American in March 2005. Around that same time, State Insulation, Inc., another of Hal's businesses, leased trucks to American, and Hal also sold two trucks to Empire.

Western subsequently brought suit against the Moores in Henrico County, Virginia Circuit Court, alleging, as is relevant here, that they violated their Non-Competes in their dealings with American and Empire. Western sought, inter alia, money damages and injunctive relief.

The Moores removed the action to federal district court, and both parties moved for partial summary judgment. The court purported to deny the motions, but in so doing, ruled that the scope of the restrictive covenants was reasonable as a matter of law. See Western Insulation, L.P. v. Moore, 2006 WL 208590, at *5-*7 (E.D. Va. Jan. 25, 2006). The court noted "the vast difference between restrictive covenants in employment agreements and restrictive covenants in the context of a sale of a business, particularly when sophisticated parties are involved." Id. at *5.

6

The court ruled that the geographical scope of the covenants was reasonable inasmuch as Western did business in approximately half of the counties in California as well as in Phoenix and that it advertises throughout California. See id. at *6. The court also ruled the seven-year length was reasonable, noting that the length of that period was an integral factor in Western's decision to purchase Western, Inc. for the price that it paid. See id. Finally, the court noted that the covenants would not impose an undue hardship on the Moores, who own several businesses, and that public policy supported enforcement of the covenants considering that they were negotiated and entered into by sophisticated parties who were represented by counsel. See id. at *7 n.6.[1]

Following a non-jury trial, the court determined that Melanie's Non-Compete was adequately supported by consideration in that she received the right to enter into an employment agreement with Western as the result of signing her Non-Compete.[2] The court also found that both Moores breached their Non-Competes. Hal was found to have breached his agreement by leasing his building and

---

[1]The court ruled, however, that genuine issues of material fact remained regarding whether Melanie's Non-Compete was supported by adequate consideration and whether the Moores breached the Non-Competes. See id. at *7-*8.

[2]The Sale Agreement provided that at closing Hal and Melanie "shall execute and deliver to [Western] an employment agreement containing terms mutually satisfactory to [Western] and him or her." J.A. 881. Melanie did indeed enter into an employment agreement with Western.

7

his trucks to American, "contacting customers of Western ... (e.g., RHA) in order to determine whether additional insulation work was available and providing work to Empire," J.A. 868, selling trucks to Empire, and hiring two former Western, Inc. employees. Melanie was found to have breached her Non-Compete by making the loan guaranties; securing a financial interest in American's assets, profits, and shares; securing an option to buy 90 percent of American; having financial oversight and control over the company; using former Western, Inc. employees and consultants for American and Empire; and giving financial advice to Barnes. The district court also determined that the Moores jointly violated the Non-Competes by "provid[ing] their long-standing business contacts and relationships" to Empire and American,[3] id. at 870, and by Melanie's use of Hal's longstanding relationship with City National Bank to help secure financing for Empire and American. As we discuss in greater detail below, the court awarded Western $943,659.00 in money damages but denied injunctive relief.

## II.

The Moores first argue that the district court erred in ruling that Melanie's right to enter into an employment agreement with

---

[3]The district court specifically cited "City National Bank, lawyer Frank Levin, long-time friend John Hardisty, insurance provider Schell & Eckert, payroll service Paychex, insulation supplier Guardian, and the car dealership Connell Chevrolet." Id. at 870.

Western was adequate consideration to support her Non-Compete. Assuming arquendo that this right did not constitute adequate consideration, we conclude that the Non-Compete was nevertheless adequately supported.

Consideration supporting a promise need not benefit the promisor himself. See Brewer v. First Nat'l Bank of Danville, 120 S.E.2d 273, 280 (Va. 1961); Restatement (Second) of Contracts § 71 cmt. e (1981). In fact, a promisee's agreement to enter into a contract with a party other than the promisor can be sufficient consideration for a promise. See Restatement (Second) of Contracts § 71 cmt. d, illus. 12. Here, the Sale Agreement provided that Melanie was required at closing to execute the Non-Compete, and indeed, the Non-Compete recited that her covenant was "consideration for and to induce the Partnership to pay the consideration set forth in the ... Sale Agreement." J.A. 951. We therefore conclude that Melanie's Non-Compete was not unenforceable for lack of consideration.[4]

### III.

The Moores next contend that the district court erred in determining that Hal violated his Non-Compete. In reviewing this determination, we review the findings of the district court

---

[4]The Moores also argue that the district court erred in ruling as a matter of law at the summary judgment stage that the restrictive covenants were reasonable in scope. We affirm that ruling on the reasoning of the district court.

9

regarding "'what the parties said or did'" for clear error, "'while principles of contract interpretation applied to the facts are reviewed de novo.'" United States v. Martin, 25 F.3d 211, 217 (4th Cir. 1994) (quoting L.K. Comstock & Co. v. United Eng'rs & Constructors, 880 F.2d 219, 221 (9th Cir. 1989)). Applying this standard, we find no valid basis for the determination that Hal breached his Non-Compete in any manner other than by hiring two former Western employees.[5]

The Moores do not deny that Hal leased property and trucks to American and sold trucks to Empire. They argue, however, that the actions did not amount even to "indirect[] ... participat[ion] in the ownership, management, operation or control of" these businesses. J.A. 943. We agree. Simply put, Western failed to demonstrate that these transactions were anything more than arm's-length business transactions, which the Non-Competes do not prohibit. Nor does the record support the finding that Hal "contact[ed] customers of Western ... (e.g., RHA) in order to determine whether additional insulation work was available and providing work to Empire." Id. at 868. The record reflects only that Hal returned a telephone call made to him by RHA and gave

---

[5]The district court found that Hal's hiring of these employees constituted a breach of his Non-Compete but that Western failed to prove damages therefrom. The Moores do not dispute that these hirings constituted breaches, and Western does not challenge the determination that it failed to prove any damages therefrom.

10

Barnes a good recommendation in the process.  Hal's Non-Compete did not prohibit such an action.

Additionally, no evidence justified a reasonable inference that Hal jointly violated the Non-Competes with Melanie.  Although the district court found that Melanie used Hal's preexisting relationships with City National Bank to help finance American and Empire, no evidence tended to show that Hal did anything to support or even permit Melanie's actions.  His mere possession of a relationship with the bank that preexisted his execution of his Non-Compete certainly could not itself constitute a violation, regardless of whether Melanie unilaterally took advantage of that relationship.  Indeed, Western's failure to show that Hal knowingly allowed Melanie to support Empire and American is what distinguishes the present case from Rash v. Hilb, Rogal & Hamilton Co., 467 S.E.2d 791 (Va. 1996), on which the district court relied.  There, the court held that the record was "replete with evidence" that a man violated a covenant not to compete similar to Hal's when he knowingly allowed his wife to use his credit card, money, automobile, and home to support a competing business.  Rash, 467 S.E.2d at 794.  Here, Hal did not offer any of his resources for his wife's use, and he had no authority to control her actions.[6]

---

[6]Melanie's loan guaranties did not affect Hal's assets, which were protected by a prenuptial agreement.

11

Similarly, Hal's preexisting relationships with other people and organizations with which Empire and American eventually did business was not itself a violation of the Non-Compete. And, even assuming that Hal's introducing Empire and American to these contacts while his Non-Compete was in force would have constituted a breach, nothing in the record gives rise to a reasonable inference that Hal made such introductions. For all of these reasons, we conclude that the district court erred in finding that Hal breached his Non-Compete (other than by hiring two former Western employees).[7]

IV.

The damages the district court awarded to Western were comprised of several components: $500,000.00 simply by virtue of its finding that the Moores both breached their agreements, $222,999.00 in profits lost from jobs Empire received, $35,460.00 in profits lost from jobs that American received, and $185,200.00 for a 2-3% general reduction in profit margin resulting from the increased competition from these companies. The Moores contend that the evidence was insufficient to support any damages award. We agree.

---

[7]The Moores also contend that the district court erred in finding that Melanie's signing of the guaranties and related documents constituted breaches. We disagree, and affirm these findings on the reasoning of the district court.

12

"[D]amages may not be determined by mere speculation or guess." Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 563 (1931). "It is well settled that damages are recoverable for loss of profits prevented by a breach of contract only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty." Boggs v. Duncan, 121 S.E.2d 359, 363 (Va. 1961) (internal quotation marks omitted).

A.

The Moores first maintain that the district court erred in awarding the $500,000 component of the damages award. The explanation offered by the district court for that component was brief:

> [T]he Court finds that in the [Sale Agreement], the [Non-Competes] were valued at $250,000.00 at the suggestion of the Moores. Western ... is, therefore, entitled to recover $250,000.00 for each of the Moores' breach of the Agreements.

J.A. 871.

Having established breaches of the Non-Competes, Western was entitled to damages sufficient to give it the benefit of its bargain, i.e., to put it in the place it would have been had the Moores not breached. See Orebaugh v. Antonious, 58 S.E.2d 873, 875 (Va. 1950). However, there was no evidence that the $250,000 figure had any relation to Western's injuries. Rather, it was simply the value that the parties assigned to the Non-Competes at

13

the time that they agreed to them.[8]  As such, it was insufficient evidence that Western was entitled to damages.

This result follows from <u>Estate of Taylor v. Flair Property Assocs.</u>, 448 S.E.2d 413 (Va. 1994).  In <u>Taylor</u>, the parties negotiated a land sale and the seller then agreed to reduce the price by $60,000 in exchange for the buyer's promise to connect the land conveyed to a sewer service.  See <u>Taylor</u>, 448 S.E.2d at 415. In an action for breach of the buyer's promise to connect the sewer, the Supreme Court of Virginia held that the amount of the price reduction was not sufficient proof of the extent of the seller's injury from the breach.  See <u>id.</u> at 416.  The court reasoned that although the parties could have agreed to a $60,000 liquidated damages provision in the contract, they had not done so. See <u>id.</u>  Similarly, here, even if the allocation of $250,000 of the sales price to the Non-Competes could be viewed as evidence of the amount Western was willing to pay for them, it did not constitute evidence of the extent of Western's injury from a breach thereof. The district court erred in treating the $250,000 value as if it were a liquidated damages provision, which it plainly was not.[9]

---

[8]The record showed that Hal Moore was allowed to choose the allocation amount because the amount had tax ramifications only for him.  See 26 U.S.C.A. § 1060 (West 2002) (requiring allocation of consideration received in an asset purchase for purpose of determining the transferee's basis in the assets and the gain or loss of the transferor with respect to the transaction).

[9]Even if there were a basis for a $250,000 award for the Moores' combined breaches, there would not be a basis for awarding

14

B.

The Moores also contend that the district court erred in awarding Western damages for lost profits for particular jobs that it lost to Empire and American. We agree.

The district court found that without the Moores' support, American and Empire would not have been in a position to compete with Western. The court further found that Western lost sales of $2,027,266.00 to Empire and $322,370.00 to American, by losing particular jobs to those companies. Based on testimony that Western historically earned a 10-12 percent profit on its work, the court found that Western suffered lost profits of $222,999.00, and $35,460.00, respectively, from these jobs. These lost-profit findings rest on several premises (in addition to the validity of the 10-12-percent figure): (1) Empire and American obtained the jobs in question, (2) Western would have received the jobs had Empire and American not, and (3) the amounts Western would have been paid for the jobs were $2,027,266.00 and $322,370.00, respectively. The Moores challenge the sufficiency of the evidence regarding each of these premises. We conclude that Western failed to prove these premises, and therefore that the district court erred in awarding the damages in question.

---

$250,000 for each of the Non-Competes that was breached. Schedule 2.7, listing the parties' allocations, listed $250,000 as the value of "Covenants Not to Compete." J.A. 968 (emphasis added).

15

We begin our analysis with the jobs that the district court found were lost to Empire. Western's only evidence that Empire was awarded any of the jobs in question were Plaintiff's Exhibits 35 and 37, both of which were documents created from information contained in Western's bid logs. The exhibits purported to contain information regarding jobs for which Western tendered bids since Empire began competing with it, including the company that received each of the jobs and the "Approximate Bid Amount" or "Project Total" for each job. J.A. 1093, 1095-1102. The Moores objected unsuccessfully to the admission of both exhibits at trial and contend again now that, for several reasons, they were not admissible to prove the facts contained in them.

One contention urged by the Moores is that the information in these exhibits regarding which companies received the jobs Western did not receive was based on inadmissible hearsay. Stephen Heim, Western's President and CEO, testified that the information in the bid logs regarding which companies received the jobs was obtained from customers through specific inquiries by Western's sales representatives, who entered the information on bid logs, which they transmitted to their branch managers, who, in turn, transmitted the logs to Heim. Western maintains that Exhibit 37 was admissible under the business record exception to the hearsay

rule, see Fed. R. Evid. 803(6).[10]  We disagree.  Even if this exception addresses the first level of hearsay--the fact that the bid logs were out-of-court declarations--it does not address the fact that the information in the bid logs was based on the out-of-court statements of agents of Western's customers.  See Fed. R. Evid. 805; Rowland v. Am. Gen. Fin., Inc., 340 F.3d 187, 195 (4th Cir. 2003).

For the exhibit to be admissible to show the truth of that information, the customers' statements must themselves fit within a hearsay exception.  See Rowland, 340 F.3d at 195.  Western argues that the statements themselves fit within the business record exception and that, alternatively, they fit within the residual

---

[10]Rule 803(6) provides:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

....

(6) Records of regularly conducted activity.--A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness ..., unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.  The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

17

hearsay exception, see Fed. R. Evid. 807. We conclude that neither is applicable.

The business record exception does not apply because Western made no showing that the information obtained from its customers was obtained from the customers' business records.[11] See 5 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 803.08[3], p. 803-61 (Joseph M. McLaughlin, ed., 2d ed. 2006) ("To qualify as a business record ..., the record must be in the form of a 'memorandum, report, record or data compilation.'"). Western suggests that the exhibit was admissible to prove Empire received the jobs in question because even if the customers' statements were not obtained directly from the customers' business records, Western verified them after receiving them. See Air Land Forwarders, Inc. v. United States, 172 F.3d 1338, 1348 (Fed. Cir. 1999) (explaining that company possessing documents prepared by another company may introduce them as its own business records, even if sponsoring witness from custodian company cannot vouch for circumstances under which documents were prepared, if custodian

---

[11]Nor did Western show that the representatives of the customers who provided the information had firsthand knowledge of the information they were passing on to Western's sales representatives. See 5 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 803.08[3], p. 803-63 (Joseph M. McLaughlin, ed., 2d ed. 2006) (explaining that "if the source of information reported in a record cannot be identified, it cannot qualify for the exception" because the record must be shown to "have been compiled by persons with knowledge of the facts recorded").

18

company "has made an independent check of the records, or can establish accuracy by other means" (internal quotation marks omitted)). However, Western points to nothing in the record to support this assertion, and we have found no support for it.

Nor do the customers' statements fit within the residual hearsay exception. That exception applies only when the evidence in question has "equivalent circumstantial guarantees of trustworthiness" as the Rule 803 or 804 exceptions, "is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts," and the proponent notifies the opposing party before trial of "the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant." Fed. R. Evid. 807.[12] None of these requirements was

---

[12]In its entirety, Rule 807 provides:

A statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

19

met here.  First, there was no indication regarding the trustworthiness of the information the customers allegedly gave to Western's sales representatives.  In fact, the customers may well have had a motive to mislead Western in order to cause Western to submit lower bids in the future.  Second, clearly it would have been more probative to produce the testimony of the customers themselves rather than secondhand accounts of the information the customers provided.  And third, Western failed to notify the Moores that they were relying on Rule 807 and failed to provide the names or addresses of the specific people who supplied the information in question.  Thus, the customers' statements were not covered by any exception to the hearsay rule, and Exhibits 35 and 37, which were based on these statements, therefore could not serve as proof that Empire was awarded any of the jobs in question.[13]

---

[13]Moreover, Heim did not claim to have any firsthand knowledge of the amounts of the contracts awarded.  Even assuming arguendo that Western established the value of the master contracts for these jobs, it failed to prove to a reasonable degree of certainty the value of the work that Western would have received had it received the contracts.  Heim conceded on cross-examination that an award of a master contract does not necessarily translate into a contract to construct the entire project for which the bid was submitted.  Heim explained that the projects are phased and houses are "released" to the contractor in groups; thus, there are circumstances in which the developer refuses to release further phases to a contractor and causes the projects to be rebid.  Therefore, even assuming that Western established the value of the master contracts, without any testimony from Empire or the customers regarding whether particular contracts were awarded for the whole project or only part of the project, there was no basis for determining the value of the work actually awarded.

Western's proof with regard to the jobs allegedly awarded to American was flawed for a different reason, namely, that Western presented insufficient evidence that it would have received the jobs absent competition from American. Two of the three jobs Western claimed to have lost to American were with The Olson Company, a San Diego company with which Heim admitted Western had "not been successful" in obtaining work. J.A. 386. Indeed, Heim testified that prior to 2005, Western was performing only 30 percent of that company's work. In light of that history, any conclusion that Western would have obtained these jobs from Olson had American not bid them could only be based on rank speculation.[14]

The third job Western claimed it lost to American was with Touchstone Development, for which Heim admitted Western had not performed any prior work. Western's only basis for claiming that it would have received the Touchstone job had American not received it was Heim's testimony that Western at one time had a contract to do the work but lost it after an increase in its materials cost prompted it to raise its price. Heim testified that after the price increase, American had the low bid and was awarded the contract. Since Western presented no testimony that after the

---

[14]Additionally, as with the jobs claimed to be lost to Empire, there was no admissible evidence that American received Olson's Paradise Walk job. In fact, Schulkamp testified that American did not receive it.

price increase, Western was the second lowest bidder, any conclusion that Western would have received the job had American not could only be based on speculation.

For all of these reasons, there was no basis in the record for a finding that, but for competition from Empire and American, Western would have received any of the jobs at issue here. Thus, the district court erred in awarding damages to Western for lost profits from these jobs.

C.

The Moores finally maintain that the district court erred in awarding damages for reduced profit margins from competition with Empire. We agree.

The basis for the award of these damages was the following testimony from Heim on direct examination:

Q    Was there ... any other way that Western Insulation
     has been damaged by competition from Empire?

A    Since Empire has been in business, our margins have
     suffered between two and three percent off of the
     gross profit we have been making.

....

Q    Can you tell me how you calculated the damage
     caused by that loss of margin?

A    I added up the total amount of sales when Empire
     was in business, May of 2005 until November of 2005
     and came up with a figure of approximately $7.4
     million, and then I took the average between two
     and three percent loss in margins, came up with the
     average of two-and-a-half, and multiplied the
     previous figure of $7.4 million by two-and-a-half
     and came up with $185,260.

22

<u>Id.</u> at 390-91. The amount of speculation necessary to reach a conclusion that Western actually would have made an additional profit of 2-3% but for American's and Empire's competition was highlighted in Heim's testimony on cross-examination. Heim testified that he arrived at the conclusion that Western lost 2-3% from its gross profit margin by reviewing monthly financial statements (that were not in evidence). He did not explain how he calculated that number, nor did he even know what profit Western had earned in any of the months for which Western is claiming damages. Although admitting that the cost of materials and fuel affects profit margins, he testified that he did not know whether those costs increased during the period in question. Nor did he even testify that Western reduced its prices during this period. In the end, all Western produced was Heim's conclusory testimony that he would have expected Western's gross profit margin to be 2-3% greater had American and Empire not been competing with it. This evidence is plainly insufficient to prove lost profits with a reasonable degree of certainty under Virginia law. <u>See</u> <u>Saks Fifth Ave., Inc. v. James, Ltd.</u>, 630 S.E.2d 304, 311 (Va. 2006) (explaining that to prove entitlement to damages, "a plaintiff must prove the amount of those damages by using a proper method and factual foundation for calculating damages"); <u>cf.</u> <u>ADC Fairways Corp. v. Johnmark Constr., Inc.</u>, 343 S.E.2d 90, 92-93 (Va. 1986) (holding that company did not prove lost profits to a reasonable

23

degree of certainty when it offered only testimony of construction company president that bid included approximately 15% in anticipated profit when 15% number was based on estimated expenses and company offered no records indicating the actual per unit expenses on project).

V.

Western argues in its cross-appeal that the district court erred in denying its request for injunctive relief. We agree.

Western requested many different forms of injunctive relief, including injunctions requiring Hal to "divest himself ... in any lease agreements with American" and Melanie to "divest herself ... of any loan guaranties" to American and Empire. J.A. 834. The district court denied injunctive relief, ruling that:

> [T]here are indispensable parties not before the Court, whose presence would be necessary in order for the Court to fashion complete injunctive relief.... Furthermore, Plaintiff has not proven all of the requisite elements for injunctive relief [because] [t]he public interest is not served by undermining legitimate commercial contracts or employment agreements when innocent third parties (e.g., banks and employees hired by American Insulation or Empire Insulation) are involved--especially if those third parties are not before the Court and have not had an opportunity to be heard.

Id. at 871-72.

Western argues that this reasoning did not justify the denial of all of the injunctive relief that it requested because much of the requested injunctive relief would not have harmed third parties had it been awarded. Western specifically points to (1) enjoining

24

the Moores from further breaching the Non-Competes by providing any additional financing or leasing equipment or property to a competing business, soliciting any additional Western employees to leave their employment or employing them, and contacting or having their employees contact customers of Western in an effort to solicit work from them; (2) enjoining Melanie from exercising the option agreement or security agreement with American or entering into any such agreement with Empire; and (3) equitably tolling the Moores' Non-Competes.  Although clearly some of the injunctive relief that Western requested would "undermin[e] legitimate commercial contracts or employment agreements," id., this subset of relief Western has identified would not do so.  Accordingly, we reverse the denial of injunctive relief on this basis and remand to the district court to determine in the first instance whether to award such relief.  In so doing, we express no opinion on whether any particular form of injunctive relief--or, indeed, any injunctive relief at all--would be appropriate.

## VI.

In sum, we affirm the rulings of the district court that the Non-Competes were enforceable and that Melanie breached her Non-Compete by entering into the guaranties and related agreements, but we reverse the finding that Hal breached his Non-Compete (except to the extent that he hired two former Western employees).  Further, we vacate the damages award and reverse the ruling of the district

25

court that injunctive relief should not be awarded because the relief requested would impact third parties not before the court. We also remand to the district court for further proceedings consistent with this opinion.[15]

<u>AFFIRMED IN PART, REVERSED IN PART,</u>
<u>VACATED IN PART, AND REMANDED</u>

---

[15]The district court awarded attorneys' fees and costs to Western as the prevailing party pursuant to the terms of the Non-Competes. Because we vacate the damages award in Western's favor, we vacate the award of fees and costs without expressing any view concerning the merits of the award.